**WAYNE COUNTY EMPLOYEES' RETIREMENT SYSTEM, individually, and on behalf of all those similarly situated, Plaintiff,**

v.

**Robert J. CORTI, Ronald Doornink, Barbara S. Isgur, Robert A. Kotick, Brian G. Kelly, Robert J. Morgado, Peter J. Nolan, Richard Sarnoff, Activision, Inc., Vivendi S.A., VGAC LLC, Vivendi Games, Inc., and Sego Merger Corporation, Defendants.**

**Civil Action No. 3534–CC.**

Court of Chancery of Delaware.

Submitted: June 30, 2008.
Decided: July 1, 2008.

Pamela S. Tikellis, Robert J. Kriner, Jr., A. Zachary Naylor, and Meghan A. Adams, of Chimicles & Tikellis LLP, Wilmington, Delaware; Of Counsel: E. Powell Miller, David H. Fink, Brian E. Etzel, and Darryl G. Bressack, of The Miller Law Firm, P.C., Rochester, Michigan, Attorneys for Plaintiff.

Edward P. Welch and Edward B. Micheletti, of Skadden, Arps, Slate, Meagher & Flom LLP, Wilmington, Delaware; Of Counsel: Harriet S. Posner, of Skadden, Arps, Slate, Meagher & Flom LLP, Los Angeles, California, Attorneys for Defendants Robert J. Corti, Ronald Doornink, Barbara S. Isgur, Robert A. Kotick, Brian G. Kelly, Robert J. Morgado, Peter J. Nolan, Richard Sarnoff, Activision, Inc., and Sego Merger Corporation.

Raymond J. DiCamillo, Elizabeth T. Sudderth, and Scott W. Perkins, of Richards, Layton & Finger, P.A., Wilmington, Delaware; Of Counsel: Joel A. Feuer, of Gibson, Dunn & Crutcher LLP, Los Angeles, California, Attorneys for Defendants Vivendi S.A., VGAC LLC, and Vivendi Games, Inc.

## OPINION

CHANDLER, Chancellor.

*World of Warcraft*, the market-leading massively multiplayer online role playing game, entices millions of paying subscribers to immerse themselves in a virtual online world. These subscribers create their own characters, and through these avatars they interact with other players,

develop skills, create a unique jargon,[1] join guilds and alliances, engage in battles, and embark on quests. The game has been described as highly addictive,[2] has had an impact on popular culture,[3] and has made an extraordinary amount of money for Blizzard Entertainment, a division of Vivendi Games.

In some ways, perhaps, the world of Mergers and Acquisitions is a massively multiplayer role playing game as well. Like in *World of Warcraft* and other games, the participants in the M & A field take on certain roles, interact in their own community, hone specialized skills, and even develop a unique, somewhat curious vernacular.[4] One particular quest in the world of M & A is disclosure litigation. In the instance of disclosure litigation presently pending before this Court, the world of M & A meets the *World of Warcraft.*

Plaintiff, the Wayne County Employees' Retirement System, a shareholder of Activision, Inc. ("Activision" or the "Company"), has moved for a preliminary injunction to stop a special meeting of the Company's shareholders scheduled for July 8, 2008. Plaintiff's specific quest is to compel the Company to make additional disclosures about the transaction the shareholders are being asked to approve at the special meeting: a proposed deal with Vivendi S.A. ("Vivendi"). The proposed transaction calls for a merger of Activision and Vivendi Games, Inc. ("Vivendi Games" or "Games") to form a new entity, Activision Blizzard. In addition to contributing Games, Vivendi will purchase newly issued shares of Activision at a price of $27.50 per share, which represents a premium over the pre-announcement price but is significantly below the current trading price. In return for Games and the cash, Activision will give Vivendi a controlling interest in Activision Blizzard. Following the combination, Activision Blizzard will commence a tender offer at the $27.50 price for up to 50% of the shares currently held by the Activision shareholders.

Plaintiff's complaint challenges the deal in numerous respects, but plaintiff has moved for a preliminary injunction only on disclosure grounds. Moreover, plaintiff's disclosure claims have shifted and changed in response to the various filings Activision has made in anticipation of the meeting. In their final iteration, plaintiff's claims are all about Games. Plaintiff argues that the Company must give its shareholders the most current internal projections from Games' management, more detailed reasons for the Activision board's continued support of the proposed transaction, and a better explanation for why Games' value was pegged at a fixed ratio to the Company's.

For the reasons explained below, plaintiff's quest for compelled additional disclo-

---

1. For example, when players create characters, they must choose from ten different races in two different factions. The factions are the "Alliance" and the "Horde," and the races include "Night Elves," "Gnomes," and "Orcs."

2. *See, e.g.,* Pagan Kennedy, *'Craft Addicts: Do Online Games Trigger a New Psychiatric Disorder?,* Boston Globe, June 8, 2008, *available at* http: //www.boston.com/bostonglobe/ideas/articles/2008/06/08/craft_addicts/; Dane Stickney, *Parents Urged to Have Web Game*

*Plan,* Omaha World Herald, May 28, 2008, 2008 WLNR 10040590.

3. *See South Park: Make Love, Not Warcraft* (Comedy Central television broadcast Sept. 30, 2006) (winner of the 2007 Primetime Emmy Award for Outstanding Animated Program).

4. *See, e.g.,* Ram Ramesh, Financial Analyst's Indispensable Pocketguide (2000) (defining terms like "poison pill," "golden parachute," "white knight," etc.)

sure must fail. Materiality is the essence of a successful disclosure claim,[5] and plaintiff has failed to demonstrate how any of the alleged omissions would significantly alter the total mix of information that is already available in the nearly 300–page definitive proxy released by the Company. As a result, plaintiff has failed to demonstrate a reasonable likelihood of success on the merits and has, therefore, failed to earn the preliminary injunction it seeks.

## I. BACKGROUND

### A. The Characters

#### 1. Activision

Activision is a leading international developer, publisher, and distributor of interactive entertainment software products. In other words, the Company makes and sells video games, and many of its games are hugely successful. Activision's diverse portfolio of products spans a wide range of categories and target markets and includes the popular *Guitar Hero, Call of Duty,* and *Tony Hawk* franchises. The Company's games are available on a wide variety of hardware platforms and operating systems, and the Company markets these games to a growing variety of consumer demographics.

Activision has performed exceedingly well in the market over the last five years. By the end of 2007, Activision had outperformed the S & P 500, NASDAQ, and the Russell 2000 over the preceding twelve month period. More importantly, the Company had outperformed all but one of its competitors in the twelve months prior to December 1, 2007. In addition to share performance, Activision has enjoyed in the past year a run of record-breaking growth and revenues. In short, the Company's financial health appears to be sound today and appears to have been sound at all times relevant to this case.

The Company has a history of exploring potential growth opportunities through combinations and partnerships with other companies. For example, since 2003 Activision has explored possible transactions with several other game industry companies and has held discussions with parties potentially interested in acquiring Activision. In 2006, Activision's senior management engaged in a strategic planning process and identified seventeen potential acquisition targets. This process was accomplished with an eye towards finding an entry opportunity into the massively multiplayer online game market, and eight of the seventeen potential targets offered such a possible entry opportunity. One of those eight was Vivendi Games.

#### 2. Vivendi

Vivendi S.A. and its affiliates VGAC LLC[6] and Vivendi Games are parties to the business combination agreement with Activision that lies at the heart of this dispute. The most important Vivendi affiliate is Vivendi Games, which has four business units: Blizzard, Sierra, Sierra Online, and Vivendi Games Mobile. Of these, Blizzard accounts for the overwhelming majority of Games' value.

The Blizzard unit generated 85% of its sales in the first quarter of 2008 from a single product, *World of Warcraft. World of Warcraft* is currently the market leader in the massively multiplayer online game industry, but plaintiff contends that its

---

**5.** *See Malone v. Brincat,* 722 A.2d 5, 12 (Del. 1998) ("The essential inquiry in such an action is whether the alleged omission or misrepresentation is material.").

**6.** VGAC LLC is the sole shareholder of Vivendi Games.

place atop the field is precarious and faces the threats of a disruptive market entrant or of subscriber fatigue. Defendants counter that *World of Warcraft* is "probably the most valuable single video game asset that exists." [7]

### 3. *Activision's Management*

Plaintiff alleges that defendants Robert A. Kotick and Brian G. Kelly were "engineers" of the deal at issue.[8] Kotick has served as Chairman of the Activision board of directors and chief executive officer of the Company since February 1991. Kelly has served as a member of the board of directors since July 1995 and has served as co-chairman of the Company since October 1998. In late 2006, plaintiff alleges, Kotick and Kelly commenced exclusive, non-public negotiations for a sale of control of Activision to Vivendi. The complaint further alleges that Kotick and Kelly, along with their selected legal and financial advisors, proceeded without direction or, in many cases, supervision from the other Activision directors. Plaintiff assails this lack of oversight, complaining that Kotick and Kelly were conflicted by virtue of their status as management. Indeed, as explained below, Kotick and Kelly did renegotiate their employment contracts while negotiations with Vivendi were ongoing.

Defendants, however, contend that plaintiffs have mischaracterized the record: Kotick and Kelly did not negotiate for new employment with Vivendi; they renegotiated their employment contracts with Activision. The new agreements replaced their existing contracts, which were set to expire in March 2008. Moreover, defendants argue, the new agreements were negotiated at arms length by the independent compensation committee of Activi-

sion's board of directors. Although plaintiff's theory of malfeasance appears to be that Kotick and Kelly betrayed the Activision shareholders in return for the promise of continued employment, there is no evidence in the record that Kotick and Kelly's jobs were ever in jeopardy. Moreover, Kotick and Kelly, combined, own roughly 7.5% of Activision's stock, thereby aligning their economic interests with those of the shareholders.

### 4. *Activision's Committee*

Because Vivendi viewed Kotick and Kelly as assets in any potential transaction, there did exist the threat of a conflict arising during negotiations. In light of these concerns about a possible conflict, the Activision board ultimately authorized the involvement of its Nominating and Corporate Governance Committee ("NCGC" or the "Committee") in the sales process. This committee consists of defendants Robert Corti, Robert Morgado, and Richard Sarnoff. Specifically, the board authorized the Committee:

(a) To review, evaluate, respond to and negotiate with respect to the proposed transaction and any other alternative transaction, offer or expression of interest in a possible business combination with Activision, if made; (b) to recommend to the board of directors a course of action, business combination or similar agreement in connection with the proposed transaction and any other proposal ... (c) to hire and retain, at the expense of Activision, such legal counsel as the NCGC deemed necessary and appropriate to advise the committee in furtherance of its responsibilities; and (d) to hire and retain, at Activision's expense, such financial advisors or experts as it deemed appropriate to advise

---

**7.** *See* June 19, 2008 Dep. of Robert A. Kotick at 144 [hereinafter "Kotick Dep."].

**8.** *See, e.g.,* Second Am. Compl. at ¶ 4.

the committee in furtherance of its responsibilities.

Despite the authority to do so, the NCGC never retained its own legal or financial advisors. Moreover, plaintiff alleges, the independence and effectiveness of the Committee was undercut by the fact that Kotick and Kelly attended its meetings. Defendants counter that the Committee saw no need to waste the resources of the Company by retaining additional advisors because it was clear that no conflict ever arose.

### 5. Advisors

Plaintiff takes issue with the work done and the disclosures about Activision's two chief advisors, Allen & Company and Skadden Arps. Allen & Company, which was retained by the Activision management, served as the Company's financial advisor throughout the negotiations. Allen & Company ultimately offered a fairness opinion on the deal. Skadden Arps, which was also retained by the Activision management, served as legal counsel to the Company and continues to defend the Company in this proceeding. In addition, Skadden served as secretary for the minutes of the Activision board's meetings during the negotiations process.

### B. The Plot

As noted above, Activision began a strategic planning process in 2006 in which it evaluated seventeen potential acquisition targets, of which eight were evaluated as potential entry opportunities into the massively multiplayer online game market. By late 2006, Kotick and Kelly, on behalf of the Company, entered exclusive, non-public discussions with Vivendi about a possible corporate combination. The talks

were extensive and broad-ranging, but they did not involve valuation aspects until April 12, 2007, when Vivendi delivered to Allen & Company a preliminary proposal that called for a transaction in which Activision would acquire Vivendi Games with Activision stock and Vivendi would become the majority shareholder of Activision.

Plaintiff alleges that Vivendi had a firm idea of how any potential transaction should be structured, and that Kotick and Kelly capitulated in exchange for the promise of employment and lucrative compensation in the new enterprise. Plaintiff alleges that the other members of the Company's board did not learn of Kotick and Kelly's discussions with Vivendi until April 29, 2007. According to the Company's definitive proxy, the board decided at its meeting on the 29th to pursue negotiations with Vivendi exclusively based on discussions of earlier contacts between management and other potential transaction partners.[9] Moreover, the board determined that the most effective way of eliciting competing offers from other parties would be to announce a proposed transaction with Vivendi if the companies ultimately agreed to one. As noted above, the Activision board authorized its NCGC on May 11, 2007 to assist management in the negotiations. The Activision NCGC's primary objective was to preserve and maximize the control premium.

Although the NCGC did not see the need to retain independent counsel or financial experts, it did advise Allen & Company as to how negotiations should proceed. Moreover, Morgado, a member of the Committee, testified in his deposition that members of the NCGC helped to articulate and form conceptual components

---

9. The board minutes from this meeting do not reflect this decision. *See* Pl.'s Opening Br. at 13. Several of the board members, however, testified that they recalled such a discussion at the meeting.

"that were crucial to the deal."[10] Finally, it was the NCGC that directed Kotick to lead the negotiations.

Throughout the remainder of 2007, while the terms of the deal were negotiated, both the Activision board and the NCGC met frequently to receive reports and analyses. Specifically, NCGC met to discuss the proposed combination on May 11, May 16, May 22, June 15, September 6, and November 16. The full board met on May 11, July 12, September 27, October 8, October 30, and December 1.

As noted, Vivendi had a firm idea of what structure it wanted the deal to take. Specifically, it envisioned a transaction in which Activision would acquire Vivendi Games from Vivendi in return for a majority interest in the combined entity. The value of the resulting entity would be, of course, the combined values of Activision and Vivendi Games. In order to simplify the valuation process, Vivendi insisted that Games be deemed to have an implied value of 47.5% of Activision. A few points necessarily flow from this. First, the fixed ratio ensured that Vivendi would receive 47.5% of the shares of the combined entity resulting from the merger of Activision and Games. Second, the fixed ratio also meant, as plaintiff repeatedly notes, that the value of Vivendi Games fluctuated along with the value of Activision.

By the summer of 2007, the parties had reached a conceptual understanding that in addition to contributing the stock of Vivendi Games at a fixed ratio through the Merger, Vivendi would make a share purchase at a significant premium. That price, of course, would not be set until closer to the finalization and announcement of the deal. The stock purchase would allow Vivendi to secure its position as a controlling shareholder of the newly formed entity. In addition, the new entity would make a post-closing tender offer at the same premium price, using a combination of Activision's cash on hand, the cash Vivendi was contributing, and, potentially, a line of credit.

In the fall of 2007, Activision broke off talks after the NCGC expressed concern about the governance of the new entity. Specifically, it rejected Vivendi's proposal to run it as a bifurcated company with two separate boards. The two sides worked through the impasse and proceeded to the difficult valuation issues. The full Activision board met twice in October 2007 to hear presentations about and review materials from the due diligence on Vivendi and to receive updates on the negotiations. By this point, it was clear that Activision was outperforming estimates and its stock was soaring.[11] The NCGC met on November 7, 2007 to determine if the Company should attempt to renegotiate the terms of the stock exchange with Vivendi in light of Activision's very strong performance. Allen & Company informed the Committee that due diligence suggested that Vivendi Games could be valued at up to $9.5 billion.[12] The NCGC determined, therefore, that the acquisition of Games represented a suitable control premium and that the most fruitful negotiation path to address Activision's rising value was to obtain an increase in the price Vivendi would pay to

---

10. June 18, 2008 Dep. of Robert Morgado at 104 [hereinafter "Morgado Dep."].

11. During the year of negotiations, Activision's stock increased in price almost $10 per share.

12. At oral argument, plaintiff contended that Allen & Company had no true justification for this increased valuation. The presentation Allen & Company gave to the Committee in November 2007 suggested that this increased valuation of Games was a result of "enhanced confidence in subscriber trends" for Vivendi Games' products.

purchase additional shares and at which the combined company would make its post-closing tender offer.

After a year of discussions, Activision and Vivendi reached a firm agreement on December 1, 2007. Specifically, the Business Combination Agreement provides for a stock purchase and post-closing tender offer at a per share price of $27.50, a significant premium to the pre-announcement trading price.[13] Defendants, of course, take the position that the true control premium paid to shareholders of Activision is Vivendi Games itself. Before approving the deal at its December 1, 2007 meeting, the board received a presentation from Allen & Company on its opinion that concluded the deal was fair from a financial point of view to the Company and its stockholders. In reaching this conclusion, Allen & Company utilized a variety of analyses, including a comparative company analysis, a comparative precedent transaction analysis, and a discounted cash flow analysis. Allen & Company used Wall Street estimates through 2010 to perform the discounted cash flow analysis instead of the Company's own internal projections and forecasts.

Plaintiff laments this decision, complaining that it made no sense to use Wall Street estimates when Activision had been outperforming the analysts' expectations all year. Allen & Company, however, determined that using management's projections would lead to a less reliable product than using Wall Street's. As disclosed in the proxy statement, Activision had updated its earnings guidance as recently as November 27, 2007, and the consensus estimates of Wall Street analysts has already impounded that information and predicted that Activision would outperform its guid-

ance. The internal projections that were current at the end of November 2007, however, forecasted only through a short period in 2008. Although other, older management projections forecasted through a longer period going forward, the then-current Wall Street estimates were more optimistic. Therefore, Allen & Company determined to use what it perceived to be the more reliable and up-to-date numbers in its fairness opinion. In contrast, in valuing Vivendi Games, Allen & Company used Vivendi management projections because it did not believe that the Wall Street analysts had adequate access to the internal forecasts to be reliable. Allen & Company's fairness report is dated December 1, 2007 and has not been updated.

The next day, December 2, 2007, the deal was announced. Because the deal requires an affirmative vote by shareholders before it can be implemented, the combination cannot commence unless it receives stockholder approval at the special meeting on July 8, 2008. To request stockholder approval, the Company has engaged in a proxy solicitation process, filing its first preliminary proxy statement with the Securities and Exchange Commission on January 30, 2008. The market reaction following the announcement was positive, and Activision's stock has increased in price, trading at around $35 per share as of late June 2008. Defendants argue that this price increase demonstrates that the market has adjusted to reflect the value of the transaction. Plaintiff, however, contends that this price increase shows that Activision is worth more than the shareholders are receiving. Specifically, plaintiff notes that Activision's stock price traded near the $27.50 deal price until May 8, 2008, when Activision

---

**13.** The $27.50 per share price represents an approximate 25% premium over the closing price on November 30, 2007, the last day of

trading before the deal was finalized and announced.

announced record performance. Defendants counter that this was also around the time the Company released expanded proxy materials that detailed the benefits of the proposed transaction. In any event, defendants further note, in 2008 both Activision and the Blizzard division of Vivendi Games have exceeded performance expectations.[14]

On April 29, 2008, the Activision board met to consider whether the board should continue to recommend the deal to shareholders in light of the performance of the Company since December. After hearing a report prepared by Allen & Company, the board determined that there was no need to change its December 1, 2007 recommendation.[15] In the roughly seven-month period since the deal was first announced, no alternative bidder has emerged for Activision. Finally, several leading investment advisory sources have recently recommended that shareholders vote in favor of this transaction. Neither party has advised the Court of a recommendation against the deal.

### C. The Case

On February 8, 2008, over two months after the deal had been announced, plaintiff filed its first complaint challenging both the deal and the disclosures pertaining to it. Two weeks later, plaintiff moved for expedited proceedings. The Court refused to grant that motion after oral argument on March 12, 2008, and suggested that the plaintiff could renew its request after the Company had filed its revised proxy statement. On April 30, 2008, the Company filed a revised preliminary proxy statement and an opening brief in support of a motion to dismiss the complaint. Rather than respond, plaintiff filed an amended complaint on May 8, 2008, and once again renewed its motion for expedition. Defendants responded by filing and briefing a motion to dismiss the amended complaint along with a motion to stay discovery. On May 22, 2008, with respect to the plaintiff's motion to expedite, the Court scheduled a preliminary injunction hearing for June 30, 2008.

On June 6, 2008, Activision filed its definitive proxy statement with the SEC. In response, plaintiff filed a motion for leave to file a second amended complaint on June 14, 2008. On June 21, after expedited discovery, including the production of more than 250,000 pages of documents and depositions of two Activision board members and Activision's financial advisor, plaintiff filed an opening brief in support of its motion for a preliminary injunction. Plaintiff's brief makes statements challenging the process leading to the deal, but plaintiff's motion is based on disclosure grounds. On June 24, 2008, Activision mailed a supplemental form to make stockholders aware of plaintiff's proposed second amended complaint and motion for a preliminary injunction. On June 25, 2008, Activision filed its answering brief in opposition to the motion for a preliminary injunction. Plaintiff's reply brief was filed on June 27, 2008, and the Court held a hearing on the motion on June 30, 2008.

**14.** Kotick and a representative of Allen & Company both testified that Vivendi Games has outperformed expectations. Plaintiff argues that this testimony is factually inaccurate. Plaintiff argues that Vivendi Games may have exceeded some of its own guidance, but it is performing only on par with what Allen & Company projected.

**15.** This meeting is disclosed in a June 24, 2008 Schedule 14A supplement to the Definitive Proxy, which states, in part, "The board reviewed its reasons for undertaking the proposed transaction and determined there was no need to change its December 1, 2007 recommendation to Activision's stockholders."

## II. MOTION FOR PRELIMINARY INJUNCTION

 The standards guiding a court of equity on a motion for a preliminary injunction are well established: moving parties must prove "(1) likelihood of irreparable harm to the plaintiffs in the absence of an injunction; (2) the likelihood of plaintiffs' success on the merits of the underlying claim; (3) a balance of the harms plaintiffs would suffer in the absence of an injunction against the harms defendant would suffer by the issuance of the injunction; and (4) the public interest."[16] This burden is not a light one, and an "extraordinary remedy" like a preliminary injunction "will never be granted unless earned."[17]

 A preliminary injunction motion is, however, the appropriate mechanism by which to challenge alleged disclosure violations.[18] The right at issue in this case and in all disclosure cases is "the right to receive fair disclosure of the material facts necessary to cast a fully informed vote," and that right, if infringed, can only be truly remedied by a specific, injunctive order mandating the appropriate disclosure before the shareholders are required to vote.[19] By their very nature, then, plaintiff's disclosure claims, if meritorious, involve irreparable harm.[20]

 The other three factors of the preliminary injunction test are more fact-specific and must be analyzed on a claim-

16. *In re CheckFree Corp. S'holders Litig.*, C.A. No. 3193–CC, 2007 WL 3262188, at *1 (Del. Ch. Nov. 1, 2007); *accord eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006) ("According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.").

17. *Lenahan v. Nat'l Computer Analysts Corp.*, 310 A.2d 661, 664 (Del.Ch.1973); *see also Emerald Partners v. Berlin*, 726 A.2d 1215, 1226–27 (Del.1999) (noting the extraordinary power of injunctive relief and the gravity of the showing necessary to obtain such relief).

18. *See In re Transkaryotic Therapies, Inc.*, C.A. No. 2776–CC, 2008 WL 2699442, at *10 (Del. Ch. June 19, 2008). Although plaintiff's complaint challenges more than the Company's disclosure, plaintiff's motion for a preliminary injunction is based solely on its disclosure claims.

19. *In re Staples, Inc. S'holders Litig.*, 792 A.2d 934, 960 (Del.Ch.2001); *see also Transkaryot-*

ic, 2008 WL 2699442, at *10 ("[T]he Court grants injunctive relief to prevent a vote from taking place where there is a credible threat that shareholders will be asked to vote without such complete and accurate information."); *Gilmartin v. Adobe Res. Corp.*, C.A. No. 12467, 1992 WL 71510, at *13 (Del.Ch. Apr. 6, 1992) ("The right to cast an informed vote is specific, and its proper vindication in this case requires a specific remedy such as an injunction, rather than a substitutionary remedy such as damages. To allow the merger to go forward would deprive the Preferred Stockholders of that right, whereas a preliminary injunction for a brief period to enable the defendants to make corrective disclosure is the remedy most likely to vindicate that right.").

20. *See Transkaryotic*, 2008 WL 2699442, at *10 n. 48 (citing numerous cases where this court has held that a violation of the duty of disclosure constitutes irreparable harm); *cf. McMillan v. Intercargo Corp.*, C.A. No. 16963, 1999 WL 288128, at *4 (Del.Ch. May 3, 1999) ("As long as the shareholders' decision is informed, the choice between whether or not to merge will be voluntary and cannot in any legally meaningful sense be said to threaten irreparable harm. In this respect the plaintiffs' irreparable harm argument conflates with, and depends entirely upon, the merits of their disclosure claim.").

by-claim basis. The fiduciary duty of disclosure, which is a specific application of the duties of care and loyalty,[21] requires that a board of directors "disclose fully and fairly all material information within the board's control when it seeks shareholder action."[22] Therefore, to establish a likelihood of success on the merits of a disclosure claim, a plaintiff "must allege that facts are missing from [the proxy] statement, identify those facts, state why they meet the materiality standard and how the omission caused injury."[23] The Delaware courts have adopted the federal materiality standard: to establish the materiality of an omitted fact, a plaintiff "must show a substantial likelihood that the omitted facts would have assumed actual significance in the deliberations of a reasonable stockholder because, if disclosed, those facts would have 'significantly altered the total mix of information' available to the stockholders."[24]

It is insufficient to allege that additional facts would help shareholders cast their votes; "[o]mitted facts are not material simply because they might be helpful."[25] Disclosure, therefore, "is ultimately asymptotic; it eventually becomes an exercise in diminishing returns."[26] The plaintiff must demonstrate how each allegedly omitted fact would "significantly alter the total mix of information already provided."[27] Moreover, "Delaware law does not require disclosure of inherently unreliable or speculative information which would tend to confuse stockholders or inundate them with an overload of information."[28] Finally, "[i]t is well understood that directors are not required to engage in 'self-flagellation' by disclosing their alleged breaches of duty."[29]

Plaintiff's disclosure claims have been, to put it mildly, a moving target. First, as noted above, plaintiff has amended its complaint on two occasions, initially in re-

**21.** *Malpiede v. Townson,* 780 A.2d 1075, 1086 (Del.2001) ("We begin by observing that the board's fiduciary duty of disclosure, like the board's duties under *Revlon[, Inc. v. MacAndrews & Forbes Holdings, Inc.,* 506 A.2d 173 (Del.1985)] and its progeny, is not an independent duty but the application in a specific context of the board's fiduciary duties of care, good faith, and loyalty.").

**22.** *E.g., Stroud v. Grace,* 606 A.2d 75, 84 (Del. 1992).

**23.** *Skeen v. Jo–Ann Stores, Inc.,* 750 A.2d 1170, 1173 (Del.2000); *see also Malpiede v. Townson,* 780 A.2d 1075, 1087 (Del.2001) ("[A] pleader must allege that facts are missing from the statement, identify those facts, state why they meet the materiality standard and how the omissions caused injury.").

**24.** *McMillan,* 1999 WL 288128, at *5 (quoting *Arnold v. Soc'y for Savings Bancorp.,* 650 A.2d 1270, 1276 (Del.1994)).

**25.** *Skeen,* 750 A.2d at 1174; *In re Siliconix Inc. S'holders Litig.,* C.A. No. 18700, 2001 WL 716787, at *9 (Del.Ch. June 21, 2001) ("Dela-

ware law does not require disclosure of 'all available information' simply because available information 'might be helpful.' " (quoting *Skeen* )).

**26.** *Berger v. Pubco Corp.,* C.A. No. 3414–CC, 2008 WL 2224107, at *3 (Del.Ch. May 30, 2008).

**27.** *Skeen,* 750 A.2d at 1174; *see also In re CheckFree Corp. S'holders Litig.,* C.A. No. 3193–CC, 2007 WL 3262188, at *2 (Del.Ch. Nov. 1, 2007) ("[P]laintiffs must explain why receiving the information *in addition to* the basic financial data already disclosed will significantly alter the total mix of information available." (emphasis added)).

**28.** *Arnold v. Soc'y for Savings Bancorp.,* 650 A.2d 1270, 1280 (Del.1994); *Globis Partners, L.P. v. Plumtree Software, Inc.,* C.A. No. 1577–VCP, 2007 WL 4292024, at *10 (Del.Ch. Nov. 30, 2007).

**29.** *In re Lukens Inc. S'holders Litig.,* 757 A.2d 720, 736 (Del.Ch.1999), *aff'd sub nom. Walker v. Lukens, Inc.,* 757 A.2d 1278 (Del.2000).

sponse to a new filing by the Company and later in response to a motion to dismiss. Second, plaintiff's most recent complaint purports to state well over ten material omissions, but by the time plaintiff filed its reply brief in support of its motion, plaintiff's claims had been whittled down to three.[30] Those three allegedly material omissions are summarized as follows: (1) the definitive proxy does not include current Vivendi Games' management projections upon which the Activision board relied in affirming its recommendation of the proposed transaction during its April 29, 2008 meeting; (2) the definitive proxy does not explain the Activision board's reasoning for determining to continue its recommendation at the April 29, 2008 meeting; and (3) the definitive proxy does not include material information about the November 2007 price renegotiation and why the board failed to renegotiate the fixed ratio between the values of Activision and Vivendi Games. For the reasons explained below, the Court finds that plaintiff has failed to show a reasonable likelihood of success on the merits of any of these three claims and, therefore, the motion for a preliminary injunction must be denied.

Moreover, in a situation where, as here, no other bidder has emerged despite relatively mild deal protection devices, the plaintiff's showing of a reasonable likelihood of success must be particularly strong. The risk that enjoining the shareholder vote will disrupt the deal and prevent the shareholders from exercising a potentially value-maximizing opportunity is not lost on this Court.[31] Although plaintiff brushed this concern aside at oral argument, it remains very real, particularly in light of current market conditions.[32] As noted below, plaintiff has failed in every respect to establish the materiality of the alleged omissions, and for that reason alone the Court will not grant a preliminary injunction. Given the lack of an alternative bidder and the decidedly unstable market, however, I would hesitate to enjoin the vote for anything other than a particularly strong showing.

### A. Management Projections for Vivendi Games [33]

██ Plaintiff's lead argument is that the Company must disclose the current

---

30. At oral argument, counsel for plaintiff conceded that there is substantial overlap among even these final three claims.

31. See McMillan v. Intercargo Corp., C.A. No. 16963, 1999 WL 288128, at *4 (Del.Ch. May 3, 1999) ("The threat of Intercargo losing its only offer if the Court issues an injunction is real, and it far outweighs the risks created by denying injunctive relief."); Solash v. The Telex Corp., C.A. Nos. 9518, 9528, 9525, 1988 WL 3587, at *13 (Del.Ch. Jan. 19, 1988) ("[T]he balance of harm in this situation in which there is no alternative transaction and issuance of the injunction inescapably involves a risk that the shareholders will lose the opportunity to cash in their investment at a substantial premium requires not only a special conviction about the strength of the legal claim asserted, but also a strong sense that the risks in granting the preliminary relief of a untoward financial result from the stockholders' point of view is small.").

32. See In re BEA Sys., Inc. S'holder Litig., C.A. No. 3298–VCL (Del.Ch. Mar. 26, 2008) (Tr. of Oral Argument and Order) at 89–90 ("[T]he disruptions in the marketplace that exist that make it more risky certainly for the court to undertake to interfere with the completion of a transaction in the time frame that is set forth by the parties and agreed to in the deal, that those risks give me—would give any judge even greater pause before moving to restrain a transaction unless very substantial grounds existed that required such action.").

33. Defendants argue that plaintiff did not fairly raise this claim until its reply brief. Plaintiff denies this. Incredibly, plaintiff suggested at oral argument that it was defendants who were being unfair by filing a sup-

internal projections for Vivendi Games because the board relied on those projections at its April 29, 2008 meeting. It was at that meeting that the Activision board approved the definitive proxy and concluded that its recommendation in favor of the proposed transaction should still stand. Plaintiff contends that this information is material for three reasons. First, plaintiff argues that the Activision shareholders will give great weight to the board's continued recommendation due to the fact that the Allen & Company fairness opinion is over seven months old.[34] Second, the plaintiff argues that the board relied on these current projections at its April 29 meeting and that somehow this reliance makes them material. Third, plaintiff argues that because all the shareholders get out of this deal is a stake in an entity that will own Vivendi Games, shareholders need all the information available on Games' value.

None of plaintiff's proffered reasons, however, demonstrates a likelihood of success on the merits. First, the definitive proxy unambiguously discloses that Allen & Company's fairness opinion concluded the transaction was fair as of December 1, 2007. This Court had held that there is no "per se rule that such documents must be

updated after a certain time."[35] Thus, the fact that the fairness opinion was seven months old does not by itself render more current internal projections of the acquirer material. Second, there is no evidence in the record that the Activision board relied on these Vivendi projections. Plaintiff has mischaracterized the supplement to the definitive proxy. The supplement states only that the board "reviewed ... the current 2008 and 2009 estimated financial results of Vivendi Games and Blizzard Entertainment as compared against those estimates reviewed [by] the board in December 2007." Frankly, not every document reviewed by the board is material. Vice Chancellor Lamb explicitly made that very point in his ruling denying a preliminary injunction in *In re BEA Sys., Inc. Shareholder Litigation.*[36] There, he stated:

[T]he fact that something is included in materials that are presented to a board of directors does not, ipso facto, make that something material. Otherwise every book that's given to the board and every presentation made to the board would have to be part of the proxy material that follows the board's approval of a transaction. That certainly is not the law.[37]

---

plement to the definitive proxy on June 24, 2008. The Court notes that it does not behoove a plaintiff to bemoan additional disclosures by the Company when the plaintiff's ultimate request for relief, in fact, would have the Court compel additional disclosure by the Company. The Court further notes that it cannot find anywhere in plaintiff's second amended complaint an allegation that the board has omitted material facts about the current projections of Vivendi Games' management. Moreover, although plaintiff's opening brief in support of its motion for a preliminary injunction argues that defendants have unfairly omitted the current projections of Activision's management—a claim plaintiff has now abandoned—the brief does not argue that defendants have breached their duties by failing to disclose current Games projections.

**34.** Plaintiff makes much of the fact that Ian Smith, the managing director of Allen & Company, testified that he could not state that his company's fairness opinion was current without rerunning all of the analyses. *See* June 17, 2008 Dep. of Ian Smith at 261–63.

**35.** *Lewis v. Leaseway Transp. Corp.,* C.A. No. 8720, 1990 WL 67383, at *7 (Del.Ch. May 16, 1990) ("If there were such a rule, I doubt it would include documents, such as those before me, that are only six months old.").

**36.** C.A. No. 3298–VCL (Del.Ch. Mar, 26, 2008) (Tr. of Oral Argument and Order).

**37.** *Id.* at 100:15–21.

Most importantly, however, the plaintiff has failed to demonstrate the materiality of the requested Vivendi Games projections. To be material, these projections must "significantly alter the total mix of information already provided."[38] Plaintiff's reply brief, however, argues that the current Vivendi Games projections demonstrate that "Games has generally kept in line with [the] estimates upon which Allen relied" in its 2007 fairness opinion.[39] The estimates upon which Allen & Company relied are already disclosed in the definitive proxy. Plaintiff has not explained how "receiving information in addition to the ... financial data already disclosed will significantly alter the total mix of information available,"[40] especially when plaintiff itself admits that the current projections are "generally" the same as those already disclosed. Plaintiff has failed to meet its burden of demonstrating the materiality of the alleged omission and has, therefore, failed to demonstrate a reasonable likelihood of success on the merits of its first disclosure claim.

### B. Rationale for Activision's Continued Recommendation in April 2008

■ At oral argument, plaintiff conceded that its second alleged material omission—the reasons and bases for the Activision board's continued recommendation—is merely a restatement of its first alleged omission. Plaintiff took the position that the Activision board based its April 29 decision to continue recommending the proposed transaction on the cur-

rent Vivendi Games' projections. As noted above, this is a mischaracterization of the Company's statement in the supplement to the definitive proxy. To the extent, therefore, this second claim is merely a recapitulation of the first, it fails for the same reasons articulated above.

To the extent, however, plaintiff is requesting that the board offer some sort of justification for its decision, plaintiff still fails to demonstrate a reasonable likelihood of success on the merits. First, the June 24, 2008 supplement to the definitive proxy already discloses the board's reasons for continuing its recommendation: the same reasons it recommended the transaction in the first place. Specifically, the supplement states that "[t]he board reviewed its reasons for undertaking the proposed transaction and determined there was no need to change its December 1, 2007 recommendation to Activision's shareholders."

Second, plaintiff has not alleged that the board had some alternative reason or basis for its continued recommendation. Although this Court could certainly order the Company and its legal counsel to concoct some basis for the board's decision, I fail to see how a post hoc justification would assume "actual significance in the deliberations of the reasonable shareholder."[41] Absent some indication in the record that the board had reasons for its April 29 decision other than what it has already disclosed, the board has no duty to invent reasons now simply because the issue is

---

**38.** *Skeen v. Jo–Ann Stores, Inc.,* 750 A.2d 1170, 1174 (Del.2000).

**39.** Pl.'s Reply Br. at 14; *see also id.* at 18–19 ("'[T]he information provided to the Board in connection with the April 29 meeting indicates Activision continues significantly to outperform but that Games is performing generally in line with expectations.'").

**40.** *In re CheckFree Corp. S'holders Litig.,* C.A. No. 3193–CC, 2007 WL 3262188, at *2 (Del. Ch. Nov. 1, 2007) (emphasis added).

**41.** *Rosenblatt v. Getty Oil Co.,* 493 A.2d 929, 944 (Del.1985) (quoting *TSC Indus. Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)).

being litigated.[42] Thus, plaintiff has failed to demonstrate a reasonable likelihood of success on the merits of its second claim.

### C. Rationale for Failure to Renegotiate the Fixed Ratio

Plaintiff's third claim is that the Company should disclose Allen & Company's November 2007 upward revision of Games' value by over $1 billion and Allen's basis for the upward revision. As noted above, in November 2007, the NCGC met to consider what the Company should do on account of its better-than-expected performance. The Committee determined that Activision should seek a higher valuation of the Company. Indeed, Activision successfully convinced Vivendi to raise the price from $24.75 to $27.50 per share. Because Activision and Vivendi had already agreed that the deal would be based around a fixed exchange ratio where Vivendi Games would be deemed to be worth 47.5% of Activision's value, the increase in the per share valuation of Activision necessarily caused the implied value of Games to increase by over $1 billion. Plaintiff argues that this should be disclosed explicitly in the proxy statement. Moreover, plaintiff argues that the proxy statement should explain "the basis for Allen's and management's acceptance of the over $1 billion increase in the value of games."[43]

Plaintiff has failed to demonstrate a reasonable likelihood of success on the merits of this claim because the requested information is not material. The fact that the increase in the per share valuation of Activision led to a corresponding increase of over $1 billion in the implied value of Games would not alter the total mix of information already available. The definitive proxy already discloses the fixed ratio; a middle school algebra student could plug in the numbers and determine precisely how the November 2007 increase in Activision's valuation affected the implied value of Games. While it might be helpful if the Company did the math for the shareholders, "[o]mitted facts are not material simply because they might be helpful."[44]

Similarly, plaintiff's contention that the Company needs to disclose the rationale for accepting this $1 billion increase in the implied valuation of Vivendi Games must fail. The definitive proxy and the Allen & Company fairness opinion, which is appended to the definitive proxy statement as Annex D, already disclose the rationale for accepting the fixed ratio. In an exchange utilizing a fixed valuation ratio, it is implicit that an increase in the valuation of one company will necessarily lead to a corresponding increase in the value of the other company. Moreover, the increase in the implied value of Vivendi Games to $8.1 billion put Games within the low end of the valuation range prepared by Allen & Company. Because the Company's disclosures already explain the basis for accepting the fixed ratio and the basis for believing that Vivendi Games was worth at least $8.1 billion, it is unclear what, exactly, plaintiff still believes is missing.[45]

---

**42.** *Cf. Malpiede v. Townson,* 780 A.2d 1075, 1088 (Del.2001) (finding no valid disclosure claim where a board did not disclose the reasons for the resignation of two directors when the amended complaint does not allege facts that the board was aware of the reasons for the resignations; the court stated, "Absent some indication that the directors informed the board of their reasons for leaving, the board did not have a duty to disclose its assumptions about why the directors resigned").

**43.** Pl.'s Reply Br. at 20.

**44.** *Skeen v. Jo–Ann Stores, Inc.,* 750 A.2d 1170, 1174 (Del.2000).

**45.** *Cf. In re CheckFree Corp. S'holders Litig.,* C.A. No. 3193–CC, 2007 WL 3262188, at *4

## III. CONCLUSION

In the role-playing game that is this disclosure litigation, both sides have played their respective roles well. Plaintiff has vigorously battled for additional information about the proposed transaction, and, indeed, additional information has been released by the Company during the pendency of this litigation. Likewise, defendants have responsively and effectively addressed the many variations of claims that plaintiff has proffered. Ultimately, however, there still remained three outstanding disclosure claims for the Court to resolve. Like any game, this one has rules, and the most essential rule of disclosure is materiality. Because the plaintiff could not establish the materiality of its final three disclosure claims, the motion for a preliminary injunction is denied. The July 8, 2008 meeting may proceed.

GAME OVER.[46]

(Del.Ch. Nov. 1, 2007) ("Plaintiffs cannot simply allege that the background section is lacking; they must explain *what* is lacking.").

