# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE COVID-RELATED RESTRICTIONS ON RELIGIOUS SERVICES | ) ) | CONSOLIDATED C.A. No. 2021-1036-JTL |

## OPINION

Date Submitted: October 12, 2022
Date Decided: November 22, 2022

Stephen J. Neuberger & Thomas S. Neuberger, THE NEUBERGER FIRM, P.A., Wilmington, Delaware; Scott D. Cousins & Scott D. Jones, COUSINS LAW LLC, Wilmington, Delaware; Thomas C. Crumplar, JACOBS & CRUMPLAR, P.A., Wilmington, Delaware; Martin D. Haverly, MARTIN D. HAVERLY, ATTORNEY AT LAW, Wilmington, Delaware; *Attorneys for Plaintiffs*.

Zi-Xiang Shen, STATE OF DELAWARE DEPARTMENT OF JUSTICE, Wilmington, Delaware; Brad D. Sorrels, Andrew D. Cordo, Daniyal M. Iqbal & Nora M. Crawford, WILSON SONSINI GOODRICH & ROSATI, P.C., Wilmington, Delaware; Attorneys *for Defendant*.

**LASTER, V.C.**

Two religious leaders have challenged restrictions that the Governor of the State of Delaware imposed on houses of worship during the COVID-19 pandemic (the "Challenged Restrictions"). The Challenged Restrictions evolved over time. Initially, they were quite strict, reflecting the profound threat that COVID-19 posed in early 2020. As the state of scientific knowledge progressed, and particularly after the arrival of vaccines, the Governor relaxed the Challenged Restrictions. The Governor lifted the Challenged Restrictions in June 2020, more than two years ago.

The plaintiffs contend that they suffered harm as a result of the Challenged Restrictions. They interpret the Delaware Constitution as imposing an absolute ban on any interference by a government official in the free exercise of religious worship. They accordingly maintain that the Challenged Restrictions violated their rights under the state constitution. The plaintiffs further assert that the Challenged Restrictions implicated their rights under the First and Fourteenth Amendments to the United States Constitution, triggering strict scrutiny. The plaintiffs argue that the Challenged Restrictions cannot survive strict scrutiny and accordingly violated their rights under the federal constitution. As a remedy, the plaintiffs seek (1) a declaration that certain of the Challenged Restrictions were unconstitutional, (2) a permanent injunction prohibiting the Governor from implementing similar restrictions in the future, and (3) nominal damages of one dollar from the Governor in his individual capacity, plus undefined compensatory damages.

The Governor has moved to dismiss the case on many grounds. For starters, he claims that this court lacks subject matter jurisdiction over the plaintiffs' claims. This decision addresses that issue.

The Court of Chancery is a court of limited jurisdiction. It can hear claims that arise in equity. It can hear claims that warrant equitable relief. And it can exercise jurisdiction conferred by statute.

The requests for declaratory judgments and awards of nominal and compensatory damages are insufficient to invoke this court's jurisdiction. The Superior Court of the State of Delaware is plainly capable of addressing the underlying legal issues in the case and providing those forms of relief. The question is whether there is something about this case that warrants the involvement of equity.

The plaintiffs' sole jurisdictional hook is their request for a permanent injunction. The Governor argues that under Delaware's test for a permanent injunction, the plaintiffs must show that they face imminent irreparable harm. The Governor argues that it is not reasonably conceivable that the plaintiffs face a threat of imminent irreparable harm given that he lifted the Challenged Restrictions more than two years ago, has no intention of re-imposing them, and has entered into a settlement agreement that resolved a federal lawsuit brought by another religious leader in which he agreed to limitations on his ability to impose restrictions on houses of worship.

The principal flaw in this argument lies in how Delaware cases have framed the test for a permanent injunction. A more searching review of precedent demonstrates that to obtain a permanent injunction, a plaintiff does not have to establish a threat of imminent irreparable harm. A plaintiff needs to prevail on the merits and show that remedies at law would be inadequate. Proving a threat of irreparable harm absent injunctive relief is one way to show that remedies at law would be inadequate. It is not the only way.

To the extent that a plaintiff relies on a threat of irreparable harm to support the issuance of a permanent injunction, the threat need not be imminent. The Delaware cases that impose that requirement have ported it over from the tests that a plaintiff must meet when seeking interim forms of injunctive relief, such as a temporary restraining order or a preliminary injunction. In those settings, the plaintiff asks the court to act before a final adjudication on the merits. The plaintiff must therefore face a threat of harm that is both (i) irreparable, in the sense that it cannot be remedied after a final adjudication on the merits, and (ii) imminent, in the sense that it will transpire before the court has a further opportunity to act. When a court determines whether to issue a permanent injunction following a final adjudication, the court is addressing the matter definitively. There is no longer any need for an imminent threat that will occur before a later stage in the case.

In seeking to defeat equitable jurisdiction, the Governor therefore cannot rely on cases which have stated that a plaintiff must establish a threat of imminent, irreparable harm to obtain a permanent injunction. But the basic thrust of the Governor's argument remains persuasive. It simply needs to be analyzed within a proper framework.

Courts of equity are rightly reluctant to allow a plaintiff to establish jurisdiction by tacking on a request for a permanent injunction to a suit that a court of law otherwise could hear. That reluctance is particularly warranted when the defendant is not currently engaging in the act that the plaintiff seeks to enjoin. The level of reluctance increases when, as here, the risk that the defendant will act is not so great as to warrant an application for interim relief.

3

Consequently, when a plaintiff seeks to ground equitable jurisdiction on the potential need for a permanent injunction, the pled facts must support a reasonable apprehension that the defendant will act in a manner that will necessitate the injunction's issuance. Under the reasonable-apprehension test, a plaintiff's subjective fears are not sufficient. There must be objectively good reasons to think that a permanent injunction will be warranted.

The plaintiffs have not pled facts that make it reasonably conceivable that the Governor will re-impose the Challenged Restrictions. During the past two years, as COVID-19 has mutated and surged, the Governor has not imposed limitations comparable to the Challenged Restrictions. Instead, the Governor has entered into a settlement with another religious leader in which he agreed not to impose restrictions that treated houses of worship differently and committed not to impose certain types of restrictions. To be sure, the plaintiffs lack standing to enforce that settlement, but that is not the issue. The settlement provides objective evidence that the Governor does not intend to re-impose the Challenged Restrictions. While it is theoretically possible that the Governor could impose future restrictions that the plaintiffs would find objectionable, that is not the test. At present, it is not reasonably conceivable that the plaintiffs have a reasonable apprehension that the Challenged Restrictions will be reimposed.

In this setting, the issuance of a declaratory judgment, with or without an attendant award of damages (nominal or otherwise), will be sufficient to resolve the plaintiffs' claims. Nothing more is required to protect the plaintiffs' interests. To the extent the plaintiffs succeed in obtaining the declaratory judgment they seek, the plaintiffs will be

4

well positioned to obtain equitable relief in the future. If they obtain that declaratory judgment and the Governor acts contrary to it, then this court can rely on the declaratory judgment as a basis to issue injunctive relief.

What the plaintiffs have not shown at this point is any basis for a prophylactic permanent injunction. The case is therefore dismissed for lack of subject matter jurisdiction. Pursuant to 10 *Del. C.* § 1902, the plaintiffs have sixty days to transfer this action to the Superior Court.

## I.     FACTUAL BACKGROUND

The facts are drawn from the complaint, the documents incorporated therein, and public sources subject to judicial notice. At this stage of the proceedings, the allegations of the complaint are accepted as true, and the plaintiffs are entitled to all reasonable inferences that the allegations support.

### A.     The State Of Emergency

On March 11, 2020, the World Health Organization declared that the COVID-19 outbreak constituted a global pandemic. Two days later, on March 13, the Governor issued a "Declaration of a State of Emergency for the State of Delaware Due to a Public Health Threat." Dkt. 32 Ex. 1 (the "Emergency Declaration" or "Decl."). The Emergency Declaration stated that it would remain in effect "until terminated as provided under state law." *Id.* at 1.

The Governor issued the Emergency Declaration in accordance with powers granted to him under Title 20, Chapter 31 of the Delaware Code (the "Emergency Management Chapter"). The Emergency Management Chapter provides that "the Governor may issue,

5

amend and rescind all necessary executive orders, emergency orders, proclamations and regulations, which shall have the force and effect of law." 20 *Del. C.* § 3115(b). Section 3115(c) grants the Governor the power to proclaim a state of emergency. It provides:

> In addition to the powers conferred upon the Governor by this chapter, a state of emergency may be proclaimed by emergency order of the Governor upon a finding that an emergency or disaster has occurred or that such occurrence or threat of that occurrence is imminent. The state of emergency shall continue until the Governor finds that the threat or danger has passed or the emergency or disaster has been dealt with to the extent that conditions necessitating a state of emergency no longer exist and terminates the state of emergency by subsequent order. No state of emergency can continue for more than 30 days without being renewed by the Governor.

*Id.* § 3115(c). Additionally, the Emergency Management Chapter permits the Governor to "[t]ake such other actions as the Governor reasonably believes necessary to help maintain life, health, property or public peace." 20 *Del. C.* § 3116(13).

As pertinent to this litigation, the Emergency Declaration advised event hosts to "cancel all non-essential mass gatherings of 100 people or more" and recommended that "those at highest risk (over age 60 and with chronic health conditions) not attend large gatherings." Decl. ¶ 6. The Emergency Declaration stated that if any large gathering took place, then the event host should provide "adequate space allowing 6 feet between individuals; adequate air flow; warm water and soap along with hand sanitizer stations; signage that emphasizes that ill individuals not attend; and a process in place to manage an ill individual safely." *Id.* The Emergency Declaration specifically addressed schools and

senior living and care facilities, but otherwise it did not prescribe specific rules for businesses or gatherings of fewer than one hundred people.[1]

## B.     The Pre-May 15th Orders

The Emergency Declaration warned that COVID-19 "will likely continue to create dangerous and potentially life-threatening public health conditions and may result in additional public safety responses." *Id.* at 1. That prediction proved prescient. As the COVID-19 pandemic worsened, and as public health authorities updated their guidance on how to respond, the Governor issued a series of modifications to the Emergency Declaration. This decision does not recount each modification. It focuses on the modifications that touch on the issues in this case.

### 1.     The Fourth Modification

On March 22, 2020, the Governor issued the "Fourth Modification of the Declaration of a State of Emergency for the State of Delaware Due to a Public Health Threat." Dkt. 1 Ex. B (the "Fourth Modification"). The Fourth Modification designated certain "businesses, establishments, and enterprises . . . as 'Essential Businesses' and 'Non-

---

[1] The Emergency Declaration encouraged schools "to review activities that bring attendees in close proximity to each other based upon the CDC's guidance for social events." *Id.* ¶ 7. The Emergency Declaration noted that the Delaware Department of Public Health was not recommending "that school facilities close at this time," but would "continue to coordinate closely with school district leadership to prevent community spread of COVID-19." *Id.* The Emergency Declaration provided a list of safety measures for senior living and care facilities to implement, such as restricting employee international travel, screening for and monitoring sickness, and stricter cleaning regimens. *Id.* ¶ 8.

7

Essential Businesses.'" *Id.* ¶ 3. Essential Businesses could remain open; Non-Essential Businesses had to close their physical locations. *Id.* ¶ 8.

Under the Fourth Modification, "[h]ouses of worship and other places of religious expression or fellowship" (collectively, "Houses of Worship") were deemed Essential Businesses and could remain open. *Id.* ¶ 6.q.12. The Fourth Modification expressly noted that Houses of Worship were "subject to the requirements of existing emergency orders, which requirements are not affected by this Order." *Id.* The only other type of Essential Business that the Fourth Modification called out with a similar "subject to" proviso was educational institutions. *Id.* ¶ 6.q.11 (noting that educational institutions were "subject to the requirements of the social distancing requirements of the prior modified declarations of the COVID-19 State of Emergency, which requirements are not affected here").

One of the requirements imposed by an earlier modification order mandated that "organizers and sponsors of public gatherings of 50 or more people cancel the gatherings immediately and not reschedule them until after May 15, 2020, or the public health threat of COVID-19 has been eliminated." Off. of the Governor John Carney, *Second Modification of the Declaration of a State of Emergency for the State of Delaware Due to a Public Health Threat* ¶ 1 (Mar. 18, 2020), *available at* https://governor.delaware.gov/health-soe/second-state-of-emergency/ (the "Second Modification"). The Second Modification also stated that,

> [o]wners and operators of places that will continue to be open to the public are strongly encouraged to ensure that no more than 50 people are present in the space at the same time and provide the precautions recommended by the CDC on COVID-19, including hand hygiene and social distancing.

*Id.* The Second Modification clarified that "[t]his does not include private businesses." *Id.* The Second Modification thus granted freedom to private businesses that the Second Modification did not provide to other types of organizations.

In addition to distinguishing between Essential Businesses and Non-Essential Businesses, the Fourth Modification identified a list of "Responsibilities of Essential Businesses." That list included:

- Excluding (i) employees who had contracted COVID-19, were reasonably suspected to have COVID-19, or who had COVID-19 symptoms and (ii) employees who "reside[d] or intimately interact[ed]" with persons who had contracted COVID-19, were reasonably suspected to have COVID-19, or who had COVID-19 symptoms. Fourth Modification ¶ 5(a)–(c).

- Excluding "individuals at highest risk of poor outcomes such as those over age 60 and those with chronic underlying conditions from on-premises work (with the exception of healthcare workers)." *Id.* ¶ 5(d).

- Following social distancing guidelines, increasing the availability of soap and sanitizer, and enhancing cleaning procedures. *Id.* ¶ 5(g)–(k).

- Prohibiting visitors "inside worksites unless they are providing essential services." *Id.* ¶ 5(m).

The Fourth Modification stated that it had "the force and effect of law," and that "[a]ny failure to comply with [its] provisions . . . constitutes a criminal offense." *Id.* ¶ 9. Thus, while framed as responsibilities of Essential Businesses, the list actually imposed mandates and restrictions.

### 2. The Ninth Modification

On April 1, 2020, the Governor issued the "Ninth Modification of the Declaration of a State of Emergency for the State of Delaware Due to a Public Health Threat." Dkt. 1 Ex. D (the "Ninth Modification"). The Ninth Modification reduced the number of people

permitted to gather from fifty to ten. *See id.* ¶ 1 ("[O]rganizers and sponsors of gatherings of ten (10) or more people shall cancel the gatherings immediately and not reschedule them until after May 15, 2020, or the public health threat of COVID-19 has been eliminated. All persons are prohibited from gathering in groups of ten (10) or more people until after May 15, 2020, or the public health threat of COVID-19 has been eliminated."). The Ninth Modification contained an exception for "gatherings of employees engaged in work at [E]ssential [B]usinesses," which were "not prohibited by th[e] Ninth Modification . . ., but remain subject to requirements for hand hygiene and social distancing." *Id.*

The Ninth Modification expanded the Responsibilities of Essential Businesses. The additional mandates and restrictions included:

- "Allow no more than twenty percent (20%) of stated fire occupancy requirements in the store at a time (approximately 150 square feet per person) [the "20% Restriction"], except that during exclusive hours for high-risk populations (including seniors), allow no more than ten percent (10%) of state fire occupancy requirements in the store at a time (approximately 300 square feet per person). . . ." *Id.* ¶ 2.

- "[C]learly mark six (6) foot spacing in checkout lines, utilize signage or ropes in any other high-traffic areas of stores, and provide similar methods to encourage adequate spacing if there are lines outside. . . ." *Id.*

- "[D]iscontinue self-serve foods and product sampling. . . ." *Id.*

- "[D]esignate staff to count the number of customers entering and exiting the store and to enforce limits, monitor social distancing and assist customers in maintaining adequate social distancing, and ensure cleaning guidelines set by the CDC are followed." *Id.*

The Ninth Modification also had the force and effect of law.

### 3. The Tenth Modification

On April 6, 2020, the Governor issued the "Tenth Modification of the Declaration of a State of Emergency for the State of Delaware Due to a Public Health Threat." Dkt. 1 Ex. E (the "Tenth Modification"). The Tenth Modification modified certain language in the Fourth Modification regarding Houses of Worship. Instead of being "subject to the requirements of existing emergency orders, which requirements are not affected by this Order," the Tenth Modification called for Houses of Worship to "comply with all social distancing requirements set forth in the COVID-19 State of Emergency declaration and all modifications, including attendance of no more than 10 people for in-person services under any circumstances." *Id.* ¶ 1(e) (the "Ten-Person Restriction"). The Tenth Modification "strongly encouraged [Houses of Worship] to transition any in-person services to remote services broadcast by telephone or video." *Id.*

The Ten-Person Restriction did not apply to any other category of Essential Businesses. There were 237 categories of businesses that the State of Delaware identified. Dkt. 1 Ex. C. Only religious organizations were "[p]ermitted to remain open but must comply with all CDC guidelines for safe social distancing, including requirement to limit gatherings to no more than ten people." *Id.* The categories of "Social Advocacy Organizations" and "Business, Professional, Labor, Political, and Similar Organizations" were designated as Essential Businesses in the same industry subsector as religious groups, but they did not have to comply with the Ten-Person Restriction. *See id.* Those organizations were only subject to the generally applicable 20% Restriction, under which they could allow no more than twenty percent of the permitted fire occupancy of their

11

premises at any one time, and during exclusive hours for high-risk populations (including seniors) could allow no more than ten percent of the permitted fire occupancy of their premises at any one time.

Only one other category of Essential Business—"Restaurants and Other Eating Places"—faced a special limitation comparable to Houses of Worship. They were only permitted to provide takeout and delivery.

On April 7, 2020, one day after the Governor issued the Tenth Modification, the Delaware Division of Public Health issued "Guidance on Worship Services." Dkt. 1 Ex. A (the "April Worship Guidance"). Although titled as "guidance," the publication imposed additional mandates and restrictions on Houses of Worship, including:

- Providing that a House of Worship must "whenever possible, conduct their activities from home or through remote audio or video services." *Id.* at 1.

- Providing that if a House of Worship did not conduct at-home or remote services, then the House of Worship was required to "follow the Governor's State of Emergency restrictions and the guidelines in this document." *Id.*

- Clarifying that the Ten-Person Restriction meant that "[n]o more than 10 individuals – including clergy, staff, and participants – may be present inside the Religious Facility during the service." *Id.* at 2.

- Prohibiting worship participants from interacting physically with clergy, staff, or other participants, including but not limited to, collecting donations by basket or plate. *Id.*

- Requiring social distancing between all participants, clergy, and staff. *Id.*

- Requiring that a House of Worship be cleaned between services, in accordance with CDC cleaning and disinfection guidance. *Id.*

- Requiring at least a four-hour gap between the end of one in-person service and the beginning of the next in-person service. *Id.*

12

The April Worship Guidance encouraged Houses of Worship to find "[a]lternative [w]ays to [w]orship," including "live streaming, social media, Zoom . . . [and] drive-in services." *Id.* at 3 (cleaned up). The April Worship Guidance provided the following additional rules for drive-in services:

- People attending the service had to remain in their vehicles at all times, but were permitted to open their windows halfway if the church's message was provided over a loudspeaker. *Id.*

- People attending services could only share a vehicle with immediate family members who lived in the same household. *Id.*

- The House of Worship could not permit any outdoor seating, including outdoor seating in an open bed of a vehicle. *Id.*

- Each vehicle had to remain at least 15 feet from any other vehicle. *Id.*

- No exchange of materials could take place between attendees and each other or attendees and the providers of the services. *Id.*

- A House of Worship had to adhere strictly to social distancing guidelines recommended by the CDC and the Division of Public Health. *Id.*

The April Worship Guidance carried the force and effect of law.

**C.     Religious Leaders Respond.**

On May 15, 2020, the Governor held a press conference during which he addressed concerns about the "need for churches to be reopened." Governor John Carney, *5/15/20: COVID-19 Briefing* at 19:54–20:45. In full, the Governor said:

> One of the things we need to make clear is that we never as an essential function, as a constitutional right, we never did close churches and places of worship in the first place, we just limited public gatherings to ten or fewer, which effectively for many of those places of worship meant that there wasn't a way for them [to] stay open.

*Id.* The parties each focus on different aspects of this statement. The Governor emphasizes his comment that he "never did close churches and places of worship in the first place." *Id.* The plaintiffs hone-in on his statement that he had "limited public gatherings to ten or fewer, which effectively for many of those places of worship meant that there wasn't a way for them [to] stay open." *Id.*

At this stage of the case, the court assumes that both comments are true. The Governor did not close Houses of Worship, as he closed Non-Essential Businesses. Nevertheless, because the Governor subjected Houses of Worship to the Ten-Person Requirement, many of them as a practical matter could not open. For those Houses of Worship, the Ten-Person Requirement operated as a *de facto* prohibition on opening.

**D.    The Eighteenth Modification**

On May 18, 2020, the Governor issued the "Eighteenth Modification of the Declaration of a State of Emergency for the State of Delaware Due to a Public Health Threat." Dkt. 1 Ex. J (the "Eighteenth Modification"). The Eighteenth Modification stated that "in-person worship can be safely resumed with appropriate precautions to protect the health of worshipers and the public." *Id.* at 2. The Eighteenth Modification retained the Ten-Person Restriction but also created an alternative path that permitted "in-person services or activities at which attendance may reach a maximum of 30% of stated fire occupancy requirements but shall be lower if needed to permit all attendees to observe CDC social distancing guidelines." *Id.* ¶ 3 (the "30% Restriction").

14

On the same day, the Division of Public Health issued revised Worship Guidance. Dkt. 1 Ex. K (the "May Worship Guidance"). The new requirements included the following:

- Each House of Worship had to post signage at each public entrance stating:

  > Do not enter if: you are at high-risk for contracting COVID-19 (65 and older or have underlying health conditions identified by the CDC as higher risk); have a cough, high fever, shortness of breath; or have been exposed to anyone who has tested positive with COVID-19 in the past 14 days;

  > Individuals age 13 and up are required to wear a cloth face covering to enter and remain inside . . . ;

  > Social distancing of 6 feet or more is required to remain inside – no handshaking, hugging, kissing is allowed (however, families and members of the same household may remain together).

  *Id.* at 1.

- The length of the service was limited to one hour. *Id.*

- Services that took advantage of the 30% Restriction could be conducted on only one day of the week. *Id.*

- Service times had to be staggered to permit cleaning before the next service. *Id.*

- Staff, volunteers, members, and visitors had to adhere to a requirement of six feet of social distancing, both inside and outside, and while seated and standing, except that members of the same household could be closer together. *Id.*

- Children had to remain with their parent/guardian at all times. *Id.*

- Seating had to comply with the requirement of six feet of social distancing, except for members of the same household who could sit more closely together. *Id.* at 2.

- Houses of Worship had to stagger arrival times for attendees, which may include but are not limited to the following methods: alphabetical order of members; entry by neighborhoods; permitting those who need assistance or special seating to enter at a designated time prior to the start of the service. *Id.*

15

- Choirs could not sing during services. *Id.*

- A House of Worship could use a single singer or a duo as long as social distancing of ten feet between the singers was observed. *Id.*

The May Worship Guidance also contained requirements for masking. On April 25, 2020, the Governor had mandated that all individuals wear cloth face coverings when riding on public transportation, when going into a business, while waiting outside the business, and when obtaining services from a healthcare provider. The only exceptions were for bona fide health reasons or for persons under two years of age. The May Worship Guidance provided as a general rule that that "[c]loth face coverings must be worn at all times." *Id.* The May Worship Guidance then listed "limited circumstances" when an individual at a House of Worship could remove a face covering. For example:

- A reader or song leader could "remove a face covering to address the audience from a podium, but had to remain at least ten feet from all staff, volunteers, members, the people served and visitors. The speaker has to put the face covering back on and use hand sanitizer immediately after speaking." *Id.*

- A presider or religious leader did not have to wear a face covering as long as they remained at least ten feet away from all other individuals at all times. *Id.*

- Any staff who sang during the service could remove a face covering only if they remained "at least 10 feet away from all staff, volunteers, members, the people served and visitors and replaced the face covering and used hand sanitizer immediately thereafter." *Id.*

- No attendees could remove their cloth face coverings to sing. *Id.*

- Holding microphones was prohibited. *Id.*

The May Worship Guidance "strongly discouraged" the "[e]xchange of materials of any kind" and stated that "[t]o the extent practicable, programs, hymnals, and prayer books should be provided in format other than paper." *Id.* at 3. The May Worship Guidance

prohibited the passing of a collection tray or the use of ushers to collect donations and mandated the use of "a stationary collection box, the mail, or electronic methods." *Id.*

The May Worship Guidance specifically required Houses of Worship to "[m]odify practices that are specific to particular faith traditions that cause close contact." *Id.* The May Worship Guidelines regulated the preparation and distribution of materials for "congregations that practice the sharing of consecrated or blessed food or drink." *Id.* They prohibited the person-to-person administering of communion and forbid the "use of communal receptacles for congregants to bless themselves with holy water." *Id.*

The May Worship Guidance only permitted "[b]aptisms, initiations, weddings and funerals . . . if the services can be performed" consistent with the guidelines. *Id.* at 4. As additional requirements for baptisms, the May Worship Guidance directed that the officiant "use hand sanitizer before beginning the baptism, and before and after anointing the candidate for baptism, and the officiant shall not hold a candidate for baptism." *Id.*

If a House of Worship complied with these rules, then it could operate under the 30% Restriction. If not, then it remained subject to the Ten-Person Restriction.

Like the April Worship Guidance, the May Worship Guidance carried the force and effect of law.

### E. The Bullock Action

On May 19, 2020, Reverend Dr. Christopher Bullock filed a lawsuit against the Governor in the United States District Court for the District of Delaware (respectively, the "Bullock Action" and the "District Court"). Bullock asserted that the Emergency Declaration, April Worship Guidance, and May Worship Guidance violated his rights

17

under the Free Exercise, Establishment, and Equal Protection Clauses of the United States Constitution. Bullock later amended his complaint to add claims under Article I Section 1 of the Delaware Constitution. Compl. ¶ 164. Bullock sought injunctive relief, including a temporary restraining order ("TRO") to maintain the status quo pending a prompt hearing on a preliminary injunction.

The District Court scheduled a teleconference for May 28, 2020, to hear oral argument on Bullock's motion for a TRO. *Bullock v. Carney*, C.A. 1:20-CV-00674 (May 26, 2020). On May 22, 2020, three days after Bullock filed his complaint and six days before the hearing on the TRO application, the Governor issued the "Nineteenth Modification of the Declaration of a State of Emergency for the State of Delaware Due To a Public Threat." Dkt. 1 Ex. M (the "Nineteenth Modification"). Effective June 1, 2020, the Nineteenth Modification eliminated the categorization of businesses into Essential and Non-Essential categories and replaced it with the industry-specific guidance found in Delaware's Phase 1 Reopening Plan. *See* Governor John Carney, *Delaware's Reopening*, https://governor.delaware.gov/wp-content/uploads/sites/24/2020/06/Delaware-Economic-Reopening-PHASE-1_Revised-6.6.20.pdf (rev. June 6, 2020) (the "Phase One Plan"). On the same day, the Division of Public Health issued updated Worship Guidance. Dkt. 1 Ex. N (the "Reopening Worship Guidance").

Under the Nineteenth Modification and the Phase One Plan, Houses of Worship could operate at 30% of their permitted fire occupancy. Nineteenth Modification ¶ 4; Phase One Plan at 23. Meanwhile, the Reopening Worship Guidance permitted in-person youth events, education, and support groups but limited those groups to ten persons per group.

18

Reopening Worship Guidance at 4. The Reopening Worship Guidance also eliminated the rule limiting services to less than one hour. *See id.* at 1. And the Revised Worship Guidance changed the rules on singing to the following:

> While singing during services is permitted, choirs should not to be utilized [sic] for singing during services. [Houses of Worship] may utilize single singers or duos as long as social distancing of six (6) feet between the singers can be observed and they are able to wear a face covering or face shield. If face coverings or face shields are not available or cannot be used, strategies such as not having the singer directly facing the congregation or increasing the distance between the singer and the congregation should be employed.

*Id.* at 2.

The Reopening Worship Guidance separately expanded the limited circumstances in which an individual did not need to wear a face covering:

> [House of Worship] staff, religious leaders, readers, and singers may address the congregation from a podium or altar, as long as social distancing of six (6) feet between them and the congregation can be observed and they are able to wear a face covering or face shield. If face coverings or face shields are not available or cannot be used, strategies such as having staff, religious leaders, readers, and singers not directly facing the congregation or increasing the distance between them and the congregation should be employed. The speaker or singer must put the face covering back on and use hand sanitizer immediately after speaking or singing.

*Id.* The Reopening Worship Guidance also modified the signage that a House of Worship had to post. *Id.* at 1.

The Reopening Worship Guidance continued to regulate the methods for preparing and distributing consecrated or blessed food or drink. *Id.* at 3–4. The Reopening Worship Guidance continued to regulate the methods of conducting baptisms. *Id.* at 4. It remained true that an officiant could not "hold a candidate for baptism." *Id.* The Reopening Worship

Guidance continued to impose rules for drive-in religious services and added a section on outdoor services. *Id.* at 4–5.

## F. The TRO Hearing

On May 28, 2020, the District Court heard oral argument on Bullock's motion for a TRO. With the Governor having the Nineteenth Modification and the Reopening Worship Guidance, the District Court observed that

> Pastor Bullock has succeeded already to a significant degree in that since the filing of the complaint, some legitimate issues that the complaint alleged respecting the . . . constitutionality . . . of the regulations then in place have been addressed and that we are now in a very different landscape than we were when the complaint was originally filed.

Dkt. 32, Ex. 3 at 4. The District Court did not regard the changes as pernicious. The judge explained that "we as a nation are in unprecedented times and . . . the State and the Governor and the folks who work for the Governor are faced with unprecedented challenges and a novel virus . . . [such] that the circumstances are in flux." *Id.* at 4–5. Recognizing that "the Governor and the folks at the State . . . face difficulties in drafting regulations," the District Court regarded it as "understandable that the regulations change as new information comes to light." *Id.* at 5.

Nevertheless, the District Court questioned whether the Emergency Declaration and the Revised Worship Guidance were provisions of general application rather than regulations specifically directed at Houses of Worship. After some back and forth, counsel for the Governor eventually agreed. *Id.* at 23–24. At that point, the District Court sounded a cautionary note and observed that because the guidance was not of general application, "it's very clear under Supreme Court case law, [the guidance] has to be narrowly tailored."

20

*Id.* at 24. The District Court also expressed a desire not to have to make "weighty constitutional decisions" on an expedited schedule. *Id.* at 44; *see id.* at 48 ("The[] [rights] are so important that it concerns me that I have to opine on them under hurried circumstances . . . .").

On May 29, 2020, the District Court denied the motion for a TRO. First, the District Court noted that the relief Bullock had requested was actually *more* restrictive than the then-operative Reopening Worship Guidance. *Bullock v. Carney*, 463 F. Supp. 3d 519, 523 (D. Del. 2020) (subsequent history omitted). Second, the District Court held that Bullock had not established a threat of imminent, irreparable harm that requires a TRO to maintain the status quo pending a hearing on a preliminary injunction. *Id.* at 524. At the time, Bullock had identified the three sources: "(1) the requirement that preachers wear a mask while preaching; (2) the requirement that the pastor (or anyone else) not hold a person during the course of a person's baptism; and (3) certain requirements that relate to the preparation and distribution of communion." *Id.* The District Court found that there was no reason to think that any of these events needed to take place imminently and that Bullock did not face irreparable harm from having to preach for a short period wearing a mask. *Id.*

On May 30, 2020, the United States Court of Appeals for the Third Circuit affirmed the denial of the TRO. *Bullock v. Carney*, 806 Fed. App'x 157 (3d Cir. 2020) (subsequent history omitted). One member of the panel dissented and would have granted emergency injunctive relief. *Id.* at 161 (Phipps, J., dissenting).

21

**G.     The Twentieth Modification**

On May 31, 2020, the Governor issued the "Twentieth Modification of the Declaration of a State of Emergency for the State of Delaware Due to a Public Health Threat." Dkt. 32 Ex. 4 (the "Twentieth Modification"). The Twentieth Modification struck the Eighteenth Modification in its entirety to the extent it applied to Houses of Worship. *Id.* ¶ D.4. The Twentieth Modification also provided that "Houses of Worship may continue to offer in-person services, provided, however, that the total number of persons permitted in a House of Worship at any one time shall not exceed thirty percent (30%) of that House of Worship's stated fire occupancy requirements." *Id.* ¶ D.5.n.

On June 2, 2020, the State issued updated guidance for Houses of Worship. Dkt. 32 Ex. 5 (the "June Worship Guidance"). The June Worship Guidance continued to discourage, but did not prohibit, in-person activity at Houses of Worship. *Id.* at 1; *see id.* at 2. The June Worship Guidance reiterated that Houses of Worship "must observe the Responsibilities for all Businesses set forth in [the] Twentieth Modification" and "strongly encouraged" Houses of Worship to "remind congregants of social distancing and hygiene requirements . . . at the start of any service." *Id.*

In a section called "Avoid the Riskiest Activities," the June Worship Guidance encouraged Houses of Worship to "[s]trongly consider discontinuing singing (and post signage discontinuing singing), group recitation, and other practices and performances where there is increased likelihood for transmission from contaminated exhaled droplets." *Id.* at 3. The June Worship Guidance reminded Houses of Worship that "[a]ny readers, speakers, or singers must comply with the Thirteenth Modification when addressing a live

22

audience." *Id.* The June Worship Guidance also encouraged Houses of Worship to "[s]trongly consider discontinuing baptisms, bathing rites, and other similar activities including officiants holding a congregant for any purpose." *Id.* And the June Worship Guidance recommended that Houses of Worship "[d]iscourage staff, congregants, and visitors from engaging in handshakes, hugs, and similar greetings that break physical distance." *Id.*

The June Worship Guidance maintained a prohibition on three types of activities: sharing microphones, sharing food or beverages across households, and accepting donations other than "through stationary box, mail, or electronic means." *Id.*

## H.     The June 4 Scheduling Conference

On June 4, 2020, the District Court held a scheduling conference. Counsel jointly requested an expedited trial on the merits and agreed that if that request was granted, then Bullock's application for a preliminary injunction would be moot. Dkt. 32, Ex. 7 at 4. Bullock stressed that the issues in the case, however, were not moot. *Id.* at 6.

The District Court agreed on both points. The District Court saw no threat of irreparable harm that would necessitate interim relief before an expedited trial, rendering the injunction application moot. But the case itself was not moot, and the court therefore scheduled an expedited trial on Bullock's damages claim and application for a permanent injunction. *See id.* at 17.

## I.      The Twenty-First Modification

On June 14, 2020, the Governor issued the "Twenty-First Modification of the Declaration of a State of Emergency for the State of Delaware Due to a Public Health

Threat." Dkt. 32 Ex. 8 (the "Twenty-First Modification"). The Twenty-First Modification increased the capacity limit for Essential Businesses to sixty percent. That increase also applied to Houses of Worship. *Id.* ¶ 7.r. The June Worship Guidance otherwise remained in effect. *Id.*

**J.    The Bullock Settlement**

On November 10, 2020, the parties to the Bullock Action reached a settlement after court ordered mediation. *See* Dkt. 32 Ex. 9 (the "Settlement Agreement"). The only parties to the settlement are Bullock and the State. *Id.* at 7.

Under the terms of the Settlement Agreement, the Governor agreed "not to impose restrictions that specifically target [H]ouses of [W]orship." *Id.* ¶ 1. The Settlement Agreement also identified a non-exclusive list of restrictions that the Governor agreed not impose:

- A 10-person gathering limit solely applying to Houses of Worship.

- A restriction limiting Houses of Worship to one service per week.

- Specific time limits on gatherings that solely apply to Houses of Worship.

- Restrictions solely applicable to religious rituals, such as communion, baptism, or the use of holy water.

- Age-based attendance limits that solely applied to Houses of Worship.

- Restrictions solely applicable to religious choirs.

- Prohibitions solely applicable to religious ministries affiliated with Houses of Worship.

- Restrictions solely targeting the use of hymnals and prayer books.

- Restrictions solely applying to collections in Houses of Worship.

24

- Prohibitions on touching of microphones solely applying to Houses of Worship.

- Requirements for mask wearing or social distancing that only apply to speakers in Houses of Worship.

*Id.* ¶ 1.1. The Settlement Agreement also provided that if there were any modifications to the Emergency Declaration that necessitated the re-introduction of the concept of Essential Businesses, then Houses of Worship would be defined as Essential Businesses.

The Governor "reserve[d] the right to impose or maintain neutral rules of general applicability." *Id.* ¶ 2.1. Bullock acknowledged that "while not specifically targeting [H]ouses of [W]orship, those rules may have an effect on [H]ouses of [W]orship." *Id.* Under the Settlement Agreement, the Governor agreed to pay $157,200 "for the benefit of" Reverend Bullock and his counsel. The parties stipulated that the Settlement Agreement did not constitute "an admission or acknowledgment of guilt, wrongdoing, liability, or financial responsibility whatsoever on the part of the Governor, including any former or present employees or agents of the Governor." *Id.* ¶ 5.1.

## K. The Original State Of Emergency Ends.

On July 13, 2021, the Governor ended the State of Emergency. He simultaneously terminated all of restrictions imposed by the Emergency Declaration, including all of its modifications. Dkt. 32 Ex. 10.

## L. The Plaintiffs File This Litigation.

On December 1, 2021, Pastor Alan Hines and Reverend David W. Landow filed separate complaints in this court. The court consolidated the actions, and the plaintiffs filed a consolidated complaint. Dkt. 16 (the "Compl.").

The complaint asserted that certain "Challenged Restrictions" in the Emergency Declaration and the Worship Guidance violated Article I Section 1 of the Delaware Constitution and the First and Fourteenth Amendments of the United States Constitution. The complaint challenged:

- Any restriction prohibiting Sunday or weekday assembly for religious worship in person, or setting any attendance limit of 10 or more on the number of persons permitted to worship.

- Any restriction preventing or directing how speech, preaching and teaching from the pulpit is to occur.

- Any restriction prohibiting speech through singing in worship of God, individually or as a group.

- Any restriction prohibiting assembly of worshipers based on age, or any other personal characteristics such as health, wealth, race, gender, or other physical or emotional characteristic.

- Any restriction prohibiting baptism or directing how the ritual is to be conducted.

- Any restriction prohibiting communion or directing how the ritual is to be conducted.

- Any restriction expressing a preference or favoritism for the practices of one established religion over another.

*Id.* at 111–12. As relief, the complaint sought:

- A permanent injunction barring the Governor and any successor from "enforcing Emergency Orders which are a violation of the constitutional rights of Pastor Hines and Rev. Landow and their congregations."

- A declaration that the Governor violated the plaintiffs' constitutional rights by enacting the Challenged Restrictions.

- Nominal damages against the Governor in his individual capacity "for one dollar, as well as compensatory damages in an amount to be set by the Court."

- Attorneys' fees, costs and pre- and post-judgment interest for this action.

26

- Any such other and further relief as the Court deems just and proper under the circumstances.

*Id.* at 111–14.

**M.    The Second State Of Emergency**

On January 3, 2022, the Governor declared a new state of emergency due to the threat posed by the surge of COVID-19 cases and hospitalizations caused by the Delta and Omicron variants of the COVID-19 virus. Dkt. 32 Ex. 12 (the "Second Emergency Declaration"). On January 10, 2022, the Governor issued the "First Revision to the Declaration of a State of Emergency for the State of Delaware Due to a Public Health Threat." *Id.* Ex. 13 (the "First Revision"). The First Revision mandated that "[a]ll individuals aged Kindergarten and up must wear a mask, regardless of vaccination status" when they are:

- an employee or rider on public transportation, or a school bus, paratransit vehicle, taxi, private car service, or ride-sharing vehicle;

- an employee or visitor at any indoor business or space open to the public; or

- whenever wearing a mask is otherwise required by law or regulation

*Id.* ¶ B.2.i. (the "Mask Mandate").

The First Revision contained seven exceptions to the Mask Mandate. One was for Houses of Worship: "Masks are not required in [H]ouses of [W]orship or places of religious expression. Individuals in [H]ouses of [W]orship or places of religious expression are strongly encouraged to wear masks and maintain at least six (6) feet of distance between themselves and others outside of that person's household whenever possible." *Id.* ¶ B.2.ii.5.

27

On March 1, 2022, the Governor declared that the second state of emergency was at an end. He therefore rescinded the Second Emergency Declaration and the First Revision.

## N.     Procedural History

In April 2022, the plaintiffs moved for judgment on the pleadings, and the Governor moved to dismiss the complaint in its entirety. The Governor argued that (1) the court lacked subject matter jurisdiction, (2) the claims for injunctive and declaratory relief were moot and thus non-justiciable, and (3) the claims for damages were barred by qualified immunity and the State Torts Claim Act. Dkt. 32 at 2. The parties briefed their competing motions. The court scheduled argument on the Governor's motion first, viewing it as logically prior to the plaintiffs' motion.

After briefing was completed and the matter was under submission, the plaintiffs submitted a letter identifying what the plaintiffs claim were new developments. Dkt. 44. The letter notes that the federal government announced that the federal declaration of a public health emergency for COVID-19 remains in effect and would remain in effect through at least March 2023. *Id.* at 1. The letter also points out that Delaware extended its public health emergency as well. *Id.* The Governor filed a letter in response arguing that these factual developments did not change the record in any meaningful way. Dkt. 45. Rather, the extensions of the public health emergencies signal only a continuation of the status quo. *Id.*

## II. LEGAL ANALYSIS

The Governor contends that this court lacks subject matter jurisdiction to hear the plaintiffs' claims. This decision agrees.

The Court of Chancery is a court of limited jurisdiction. The court "can acquire subject matter jurisdiction in the first instance by three different means: (1) the invocation of an equitable right; (2) a request for an equitable remedy when there is no adequate remedy at law; or (3) a statutory delegation of subject matter jurisdiction." *Kraft v. WisdomTree Invs., Inc.*, 145 A.3d 969, 973 (Del. Ch. 2016) (cleaned up). "[W]here a remedy provided by a law court of the state would be sufficient, that is, complete, practical and efficient, this Court is without jurisdiction." *Int'l Bus. Machines Corp. v. Comdisco, Inc.*, 602 A.2d 74, 78 (Del. Ch. 1991) (cleaned up).

The court determines whether it has subject matter jurisdiction by looking to the face of the complaint. *Diebold Comp. Leasing, Inc. v. Com. Credit Corp.*, 267 A.2d 586, 590 (Del. 1970). When a party seeks to ground jurisdiction on the need for an equitable remedy,

> a judge in equity will take a practical view of the complaint, and will not permit a suit to be brought in Chancery where a complete legal remedy otherwise exists but where the plaintiff has prayed for some type of traditional equitable relief as a kind of formulaic 'open sesame' to the Court of Chancery.

*Comdisco*, 602 A.2d at 78. "The party seeking the Court's intervention bears the burden of establishing jurisdiction." *Shore Invs., Inc. v. BHole, Inc.*, 2009 WL 2217744, at *2 (Del. Ch. July 14, 2009).

29

The plaintiffs ground the existence of equitable jurisdiction on their request for a permanent injunction. For the reasons that follow, that requested remedy cannot support equitable jurisdiction in this case.

## A. The Red Herring Of Imminent Irreparable Harm

The Governor argues that the plaintiffs' request for a permanent injunction cannot support equitable jurisdiction because they plainly cannot meet one of the elements that Delaware cases identify as a required element for the issuance of a permanent injunction. Delaware decisions have framed a three-part test for a permanent injunction that assumes a plaintiff must make the same showing necessary to obtain a preliminary injunction, but with actual success on the merits substituted for a reasonable probability of success on the merits. The seminal decision in Delaware that announced the prevailing test expressed the formulation in precisely those terms, stating that when a "permanent injunction is being sought, the standards are identical [to those of a preliminary injunction], except that actual, rather than probable, success on the merits is the relevant criterion." *Draper Commc'ns, Inc. v. Del. Valley Broad. Ltd. P'ship*, 505 A.2d 1283, 1288 (Del. Ch. 1985). Relying on *Draper*, a later decision framed the test as follows:

> The standard for granting a permanent injunction requires [the moving party] to demonstrate that: (1) it has proven actual success on the merits of the claims; (2) irreparable harm will be suffered if injunctive relief is not granted; and (3) the harm that will result if an injunction is not entered outweighs the harm that would befall the [non-moving party] if an injunction is granted.

*Christiana Town Ctr., LLC v. New Castle Ctr.*, 2003 WL 21314499, at *2 (Del. Ch. June 6, 2003) (footnotes omitted)), *aff'd sub nom. Christiana Town Ctr. LLC v. New Castle Cnty.*, 841 A.2d 307 (Del. 2004) (TABLE).

30

Building on these authorities, the Governor argues that the plaintiffs only will be able to obtain a permanent injunction if they can point to a threat of imminent and irreparable harm. The Governor argues that accepting that a denial of the right to worship under the federal and state constitutions constitutes irreparable harm,[2] there is no imminent threat that he will take action to impinge on the pastors' rights that could warrant the issuance of injunctive relief. Therefore, he says, this court lacks jurisdiction.

It turns out that the ostensible need to show imminent irreparable harm as a precursor to the issuance of a permanent injunction is a red herring. That formulation departs from how authoritative treatises and cases from other jurisdictions frame the test for a permanent injunction. Under the prevailing test, the narrower requirement to establish imminent and irreparable harm gives way to a more general requirement to show that legal remedies would be inadequate. Showing of irreparable harm is one way to demonstrate that legal remedies would be inadequate, but it is not the only way. Moreover, the

---

[2] *See, e.g.*, *Tandon v. Newsom*, 141 S. Ct. 1294, 1297 (2021) (determining that applicants were entitled to an injunction pending appeal; finding that applicants "are irreparably harmed by the loss of free exercise rights for even minimal periods of time" (cleaned up)); *Allee v. Medrano*, 416 U.S. 802, 815 (1974) (finding that workers "required protection from [law enforcement's] concerted conduct" in order to "continue furthering their cause by constitutional means," and that "[n]o remedy at law would be adequate to provide such protection"); *Ne. Penn. Freethought Soc. v. Cnty. of Lackawanna Transit Sys.*, 938 F.3d 424, 442 (3d Cir. 2019) ("No remedy at law can cure [plaintiff's] First Amendment injury or give it the prospective relief it seeks."); 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2944 (3d ed.), Westlaw (database updated Oct. 2022) ("[I]f a constitutional violation is established, usually no further showing of irreparable injury is necessary.").

considerations warranting permanent injunctive relief need not be imminent. They need only be sufficient to render legal remedies inadequate.

Sometimes a Delaware decision deviates from a settled or majority rule intentionally and for good reason.[3] Other times, a little digging uncovers one of the inevitable spontaneous mutations generated by an adversarial process in which practitioners understandably seek to depict authorities in the manner most favorable to their clients, and in which busy judges do not always have the time for reflective consideration of every legal issue in the case.

Delaware's customary framing of the standard for a permanent injunction errs by projecting onto the ultimate remedial determination the requirement from earlier phases of the case that a plaintiff show imminent irreparable harm. When a party seeks interim injunctive relief, such as through a TRO or preliminary injunction, the plaintiff must show why the court needs to act at an early stage, before a final adjudication. A plaintiff makes the necessary showing by pointing to a threat of something happening that cannot be addressed after a final adjudication during the remedial phase, *i.e.*, a threat of irreparable

---

[3] *See Aranda v. Philip Morris USA Inc.*, 183 A.3d 1245, 1251–52 (Del. 2018) ("Although the federal courts and most state courts require an available alternative forum before dismissing for *forum non conveniens*, our Court never adopted this requirement. Admittedly, our cases have not directly addressed the question. But, several factors point to an implicit rejection of the requirement." (footnotes omitted)); *Abry P'rs V, L.P. v. F & W Acq. LLC*, 891 A.2d 1032, 1059–64 (Del. Ch. 2006) (Strine, V.C.) (discussing the majority rule in Restatement (Second) of Contracts § 195 which prevents a contract from insulating a party from the consequences of its fraudulent conduct, then permitting a contractual anti-reliance clause to defeat a claim for extra-contractual fraud).

harm. Additionally, the threat must relate to something that may transpire before the case can reach a final adjudication during the remedial phase, *i.e.*, it must be imminent. To earn a TRO or a preliminary injunction, therefore, a plaintiff must show imminent irreparable harm.

But when a plaintiff seeks permanent injunctive relief after a final adjudication, a showing of irreparable harm is sufficient but not necessary. As a leading procedural treatise explains,

> it should be noted that although a serious threat of irreparable injury usually must be shown on an application for a temporary-restraining order or a preliminary injunction, irreparable injury is not an independent requirement for obtaining a permanent injunction; it is only one basis for showing the inadequacy of the legal remedy.

Wright & Miller, *supra*, § 2944 (footnotes omitted). There is also no longer a near-term temporal requirement for the harm to take place before the court can review the matter further. Because the court is issuing its final ruling, the question is whether a permanent injunction is warranted because legal remedies are inadequate. The considerations driving that analysis need not be imminent; they need only be persuasive.

This decision rejects the Governor's argument that a permanent injunction requires a showing of imminent irreparable harm. The more detailed explanation unfolds in three parts. First, this decision describes the different forms of injunctive relief and the purposes they serve, which illustrates why imminent irreparable harm is a necessary element of the test for a TRO or a preliminary injunction but not for a permanent injunction. Second, this decision explains why the proper formulation of the standard for a permanent injunction should examine the inadequacy of other remedies. Finally, this decision explores how the

33

irreparable injury prong entered Delaware's permanent injunction test and confirms that it reflects an unintentional jurisprudential mutation rather than a conscious choice.

### 1.     The Types Of Injunctive Relief

Injunctive relief comes in three flavors: TROs, preliminary injunctions, and permanent injunctions. The choice among them depends on the amount of time the court has to deal with the issue and the state of the record. A TRO is used in emergencies, typically at the outset of a case. A preliminary injunction is used when there is enough time to develop a preliminary factual record, typically at an early stage of the case, but not enough time for a final adjudication. A permanent injunction issues at the end of the case, after a final adjudication. The different stages of the case result in subtly different framings in the standard for each form of relief.[4] As Chancellor Allen warned, decisions sometimes "blur the distinctions" between these different forms of relief "without acknowledging or discussing the functional and procedural differences." *Cottle v. Carr*, 1988 WL 10415, at *2 n.3 (Del. Ch. Feb. 9, 1988) (Allen, C.) (comparing TROs with preliminary injunctions).

### a.     Temporary Restraining Orders

The first form of injunctive relief is a TRO. It is an emergency remedy that "operates to suspend threatened action so that the parties and the Court will have an opportunity to

---

[4] Each flavor of relief also can take one of two forms. One form is a prohibitive injunction stopping a defendant from taking action. The other form is a mandatory injunction compelling a defendant to take affirmative action. Particularly at early stages of the case, mandatory forms of relief require a greater showing. This case involves a request for prohibitive relief, so this decision focuses on that form.

consider a preliminary injunction application on a better developed record." Donald J. Wolfe & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 16.02 (2d ed. 2021). Put another way, "[t]he purpose of a temporary restraining order is twofold: to protect the status quo and to prevent imminent and irreparable harm from occurring pending a preliminary injunction or final resolution of a matter." *CBOT Hldgs., Inc. v. Chi. Bd. Options Exch., Inc.*, 2007 WL 2296356, at *3 (Del. Ch. Aug. 3, 2007). A TRO is an emergency remedy. *Cottle*, 1988 WL 10415, at *6.

To prevail on a motion for a TRO, the moving party must demonstrate that "(i) it has a colorable claim on the merits; (ii) it will suffer irreparable harm if relief is not granted; and (iii) the balance of hardships favors the moving party." *Stirling Inv. Hldgs., Inc. v. Glenoit Universal, Ltd.*, 1997 WL 74659, at *2 (Del. Ch. Feb. 12, 1997). Of the three elements, the presence of imminent, irreparable harm is "the *sine qua non* of such relief." *Cottle*, 1988 WL 10415, *6. That element predominates because the purpose of a TRO is to preserve the status quo so that the court can conduct a fuller inquiry at a later stage of the case, typically by conducting a hearing on an application for a preliminary injunction. Without a showing of irreparable harm, there is no need for the court to act at an early stage of the case, because the remedy can await the remedial stage. Without a showing of *imminent* irreparable harm, there is no need for the court to act so early in the case, and the court can await a fuller record.

A party seeking a TRO thus must point to a threat of harm that is both irreparable in the sense of not fixable during the remedial phase and imminent in the sense of likely to happen before a later stage of the case. Without that element, a TRO is not necessary.

35

### b. Preliminary Injunctions

The second form of injunctive relief is a preliminary injunction. Like a TRO, it is a provisional remedy, but the goal is to preserve the status quo pending a final adjudication on the merits. Wolfe & Pittenger, *supra*, § 16.02. As with TROs, Delaware cases often describe the issuance of a preliminary injunction as "extraordinary relief," but not in the colloquial sense of amazing, astonishing, miraculous, or incredible. The remedy is out of the ordinary (and hence extraordinary) because, in the ordinary course of a case, the court does not grant relief until after a final adjudication. A preliminary injunction departs from the ordinary course of a case because the court grants relief at a preliminary stage, based on a preliminary record.

The standard for a preliminary injunction resembles the standard for a TRO, but with a greater burden on the plaintiff because the parties have had an opportunity to create a preliminary factual record.

> When seeking a preliminary injunction, a plaintiff must demonstrate a reasonable probability of success on the merits and that some irreparable harm will occur in the absence of the injunction. Furthermore, in evaluating the need for a preliminary injunction, the Court must balance the [moving party's] need for protection against any harm that can reasonably be expected to befall the [non-moving party] if the injunction is granted.

*Mills Acq. Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1278–79 (Del. 1989). The required showing on the merits thus intensifies from a colorable claim to a reasonable probability of success.

As with a TRO, the "*sine qua non* of preliminary injunctive relief" is "the threat that irreparable harm will befall them between now and trial unless an injunction issues."

36

*Kingsbridge Cap. Gp. v. Dunkin' Donuts Inc.*, 1989 WL 89449, at \*4 (Del. Ch. Aug. 7, 1989); *Nebeker v. Berg*, 115 A. 310, 311 (Del. Ch. 1921) ("Such [preliminary] injunction generally is employed to prevent mischief to come, and ought to do no more than preserve the status quo pending the decision of the cause at the final hearing on proofs taken." (cleaned up)). That element is required because the purpose of a preliminary injunction is to preserve the status quo so that the court can hold a trial, make findings of fact, render conclusions of law, and issue a remedy. As with a TRO, if there is no threat of irreparable harm, then the matter can be addressed through the final remedy. And as with a TRO, if there is no threat of *imminent* irreparable harm, then there is no need for the court to act before the remedial phase.

### c.     Permanent Injunctions

The final form of injunction is a permanent injunction. Unlike TROs and preliminary injunctions, a court issues a permanent injunction at the end of the case, after a trial on the merits, as part of an award of final relief. And unlike TROs and preliminary injunctions, a permanent injunction does not maintain the status quo pending a more detailed or final adjudication. A permanent injunction is final relief; it is "a decree of the court whereby defendant is perpetually inhibited from the assertion of an assumed right, or perpetually restrained from the commission of an act which would be contrary to equity and good conscience." James L. High, *A Treatise on the Law of Injunctions as Administered in the Courts of the United States and England* § 3, at 4 (1879).

Because a permanent injunction is final relief, it does not require a showing of imminent irreparable harm. The remedy requires a showing that legal remedies are

inadequate. A showing of irreparable harm can satisfy that requirement. But establishing irreparable harm is not strictly necessary. The plaintiff also need not establish that the risk of harm is so imminent that it may arise before the end of the case. The litigation has reached the end, so the need for interim relief is no longer a consideration. As one commentator explains,

> [a]lthough the vocabulary of adequate remedy and irreparable injury is common to both preliminary and permanent relief, the competing considerations are quite different. . . . Denying relief at the preliminary stage protects defendant's right to a full hearing, and a stringent variation of the irreparable injury rule lets the court openly balance the risks to each side. Preliminary relief is best considered as a separate issue, only distantly related to the choice of remedy at final judgment.

Douglas Laycock, *The Death of the Irreparable Injury Rule*, 103 Harv. L. Rev. 687, 691–92 (1990).

### 2.     The Need To Show That Legal Remedies Are Inadequate

Authorities outside of Delaware make clear that the settled test for obtaining a preliminary injunction requires that the plaintiff demonstrate that legal remedies are inadequate. A plaintiff does not have to show imminent irreparable harm. Admittedly, showing irreparable harm is one way of demonstrating that legal remedies are inadequate, but it is not the only way.

A number of federal decisions make this point. [5] An opinion by Judge Posner provides a representative discussion:

---

[5] *See Brown v. Sec'y, U.S. Dep't of Health and Human Servs.*, 4 F.4th 1220, 1234 n.9 (11th Cir. 2021) (Tjoflat, J., concurring) ("In many cases, we analyze whether a movant has suffered an 'irreparable harm' and whether the movant lacks an 'adequate legal

38

when, as in this case, the issue is whether to grant a permanent injunction, not whether to grant a temporary one, the burden is to show that damages are inadequate, not that denial of the injunction will work irreparable harm. "Irreparable" in the injunction context means not rectifiable by the entry of a final judgment. It has nothing to do with whether to grant a permanent injunction, which, in the usual case anyway, *is* the final judgment.

---

remedy' together. . . . But it is important to note that the two requirements should not always be conflated. The requirement of an inadequate remedy at law determines whether the movant may pursue *any* equitable relief, and the requirement of an irreparable injury determines whether the movant may pursue *preliminary injunctive* relief."), *vacated by* 20 F.4th 1385 (11th Cir. 2021) (Mem.); *Cont'l Airlines, Inc. v. Intra Brokers, Inc.*, 24 F.3d 1099, 1104 (9th Cir. 1994) ("Irreparable injury is required for preliminary injunctions, but once actual success on the merits has been established, a party is entitled to relief as a matter of law irrespective of the amount of irreparable injury which may be shown. Irreparable injury is not an independent requirement for obtaining a permanent injunction as opposed to a preliminary injunction or temporary restraining order; it is only one basis for showing the inadequacy of the legal remedy." (cleaned up)); *Crane by Crane v. Ind. High Sch. Athletic Ass'n*, 975 F.2d 1315, 1326 (7th Cir. 1992) ("To justify entry of a permanent injunction, [plaintiff] had to prove that he had no adequate legal remedy. He was not required, however, to show irreparable injury." (citations omitted)); *Buckingham Corp. v. Karp*, 762 F.2d 257, 262 (2d Cir. 1985) ("Though the appropriateness of both permanent and preliminary injunctions depends on equitable considerations and the adequacy of monetary relief, irreparable injury is not an independent requirement for obtaining a *permanent* injunction . . . ." (cleaned up)); *Lewis v. S.S. Baune*, 534 F.2d 1115, 1123–24 (5th Cir. 1976) ("In not all cases where the petitioner fails to show irreparable injury will he still be denied a permanent injunction. . . ."); *Rose v. Cahee*, 727 F. Supp. 2d 728, 740 (E.D. Wis. 2010) ("Entry of a permanent injunction requires a plaintiff to prove that he or she had no adequate legal remedy."); *Crutchfield v. U.S. Army Corps of Eng'rs*, 192 F. Supp. 2d 444, 456 n.16 (E.D. Va. 2001) ("[I]n the context of a permanent injunction, it is not necessary for the moving party to show that it will be irreparably harmed by the failure to grant the injunction." (cleaned up)); *see also Temple Univ. v. White*, 941 F.2d 201, 213–14 (3d Cir. 1991) (recognizing conflicting authorities on the necessity of proving irreparable injury; deciding not to enter the "thicket" because irreparable harm was shown). *Cf. Fox v. Standard Oil Co. of N.J.*, 294 U.S. 87, 94 (1935) (Cardozo, J.) (affirming the District Court's conclusion that a "resort to equity was permissible" where there "was an imperfect remedy at law"; complainant sought to "restrain the state tax commissioner from paying into the treasury" license taxes paid under protest and requested both "interlocutory and permanent relief").

*Walgreen Co. v. Sara Creek Prop. Co., B.V.*, 966 F.2d 273, 275 (7th Cir. 1992) (internal citations omitted).

Leading commentators agree. As noted previously, Wright & Miller explain that "irreparable injury is not an independent requirement for obtaining a permanent injunction; it is only one basis for showing the inadequacy of the legal remedy." Wright & Miller, *supra*, § 2944. Other authorities contain similar statements.[6]

The response to the United States Supreme Court's unexpected announcement of a four-part test for the issuance of permanent injunctive relief is telling. In 2006, the United States Supreme Court claimed to describe the "traditional" test for a permanent injunction as follows:

> A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

---

[6] *See* John Norton Pomeroy, *A Treatise on Equity Jurisprudence*, § 1338 (5th ed. 1941) ("Equity will not interfere to restrain the breach of a contract, or the commission of a tort, or the violation of any right, when the legal remedy of compensatory damages would be complete and adequate. The incompleteness and inadequacy of the legal remedy is the criterion which, under the settled doctrine, determines the right to the equitable remedy of injunction."); 43A C.J.S. *Injunctions* § 42, Westlaw (database updated Nov. 2022) ("To be entitled to a permanent injunction, the petitioner must demonstrate that there is no adequate remedy at law, a balance of the equities favoring the moving party, and success on the merits."); 42 Am. Jur. 2d *Injunctions* § 26, Westlaw (database updated Nov. 2022) ("A legal remedy is inadequate, so as to warrant a permanent injunction, when a party is unlikely to be made whole by an award of monetary damages or some other legal remedy, or the legal remedy is not as practicable and efficient toward the ends of justice as an injunction." (footnotes omitted)).

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). A chorus of remedies

scholars objected to the four-part framing, decried it as not the "traditional" test, and

criticized the redundancy of the first two prongs, which purported to require both a showing

of irreparable injury and no adequate remedy at law.[7] Judges also called out the error, with

the United States Court of Appeals for the Third Circuit writing that "[a]lthough *eBay*

identified irreparable harm and the adequacy of legal remedies as separate considerations,

they typically constitute two sides of the same inquiry, for the availability of adequate

monetary damages belies a claim of irreparable injury." *TD Bank N.A. v. Hill*, 928 F.3d

259, 282 (2019) (cleaned up).[8]

---

[7] Mark P. Gergan, John M. Golden, & Henry E. Smith, *The Supreme Court's Accidental Revolution? The Test for Permanent Injunctions*, 112 Colum. L. Rev. 203, 205 (2012); *see* Doug Rendleman, *The Trial Judge's Equitable Discretion Following* eBay v. MercExchange, 27 Rev. Litig. 63, 76 n.71 (2007) ("Remedies specialists had never heard of the four-point test. Although one might argue that the four points can be found in [*Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982)], the Court appears to vindicate a 'traditional' standard for a final injunction that never existed, except perhaps for a preliminary injunction."); *see also* Samuel L. Bray, *The Supreme Court and the New Equity*, 68 Vand. L. Rev. 997, 1026–27 (2015) ("And most scholars, though not all scholars, think these are actually two formulations of a single doctrine: an injury is considered irreparable *if* there is no adequate remedy at law." (footnotes omitted)).

[8] One Delaware decision has cited *eBay*, *Wayne County Employees' Retirement System v. Corti*, 954 A.2d 319, 329 n.16 (2008). That decision addressed an application for a preliminary injunction, and it cited *eBay* as supporting Delaware's test for the issuance of a preliminary injunction, even though *eBay* established a test for permanent injunctions. *Id.* Delaware thus has not adopted the *eBay* formulation.

The weight of authority thus shows that imminent irreparable harm is not a requirement for a permanent injunction. Because it is a final *remedy*, what matters is whether there is a basis for equity to act, namely the absence of an adequate remedy at law.

### 3.    How Delaware Arrived At Its Current Formulation

So far, this decision has shown why imminent irreparable harm is not a *sine qua non* for the issuance of permanent injunctive relief. The question then becomes why Delaware has adopted a different test. Sometimes, Delaware courts have good reasons for choosing not to follow a settled approach or a majority rule. Other times, unintended departures happen. The framing of the test for a permanent injunction appears to be one of the latter situations.

When tracing the origins of the formulation, all roads lead to *Draper*. 505 A.2d 1283. Often, the path to *Draper* runs through the *Christiana Town Center* decision, which relied on *Draper*'s formulation. *See Christiana Town Ctr.*, 2003 WL 21314499, at *2.[9]

*Draper* involved a combined application for preliminary and permanent injunctive relief. 505 A.2d at 1288 ("This matter is submitted on a combined application for preliminary and permanent injunctive relief."). The plaintiff, Draper Communications, Inc.

---

[9] *See, e.g.*, *N. River Ins. Co. v. Mine Safety Appliance Co.*, 105 A.3d 369, 379 n.47 (Del. 2014) (citing *Christiana Town*); *Nat'l Indus. Gp. (Hldg.) v. Carlyle Inv. Mgmt. L.L.C.*, 67 A.3d 373, 383 n.36 (Del. 2013) (citing *Draper*); *Council of Ass'n of Unit Owners of Pelican Cove Condo. v. Yeilding*, 2019 WL 2339531, at *8 n.79 (Del. Ch. June 3, 2019) (citing *North River* and *Christiana Town*); *Qwest Commc'ns Int'l Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 821 A.2d 323, 327–28 (Del. Ch. 2002) (citing *Draper*); *ID Biomedical Corp. v. TM Techs., Inc.*, 1995 WL 130743, at *15 (Del. Ch. 1995) (citing *Draper*).

("Draper"), had been using the call letters "WBOC" since 1954. In the 1980s, Delaware Valley Broadcasters Limited Partnership sought to build a television station with the call letters "WBOT." Draper thought the similar call letters would create a risk of confusion and sought both preliminary and permanent relief.

The court started with the "well established" test for a preliminary injunction. *Id.* Without elaboration, the court then stated, "Where a permanent injunction is being sought, the standards are identical, except that actual, rather than probable, success on the merits is the relevant criterion." 505 A.2d at 1288. The court's sole citation for this proposition was *Galella v. Onassis*, 353 F. Supp. 196 (S.D.N.Y. 1972), *aff'd in part, rev'd in part by* 487 F.2d 986 (2d Cir. 1973). *Galella*, however, does not state that irreparable harm is a prerequisite to issuing a permanent injunction. That decision instead recites that "[p]ermanent injunctive relief is available where there is no adequate remedy at law, where the balance of the equities favor the moving party, and where success on the merits (probability of success for a preliminary injunction) have been demonstrated." *Galella*, 353 F. Supp. at 235. It is not clear how *Draper* concluded that irreparable harm was a necessary element for a permanent injunction.

To be fair, as this decision has acknowledged, a showing of irreparable harm is one way to demonstrate the inadequacy of remedies at law.[10] But it is not the only way.[11] Other ways include:

- Showing that the defendant acted "in such a way that the plaintiff may be required to bring more than one suit to effectuate his legal remedy. . . ." Dan B. Dobbs, Law of Remedies: Damages—Equity—Restitution, § 2.5, at 57 (2d ed. 1993).

- Showing that although money would be an adequate remedy, "the defendant is insolvent and [the judgment] is not collectible." *Id.* In this setting, a permanent injunction may issue if "the defendant is still capable of rendering the performance to which the plaintiff is entitled as an alternative to the money. . . ." *Id.* at 57–58.

- Showing that the plaintiff is entitled to damages "if damages could be measured with any reasonable degree of accuracy, but under the facts damages are so speculative that any award is likely to be inadequate." *Id.* at 58.

---

[10] *See* Wolfe & Pittenger, *supra*, § 14.03 ("Though the nature of the harm may be irreparable in the sense that no adequate final remedy would exist if the harm occurred, a preliminary injunction is not warranted unless that injury is likely to occur prior to the time by which a final order following a trial can be secured."). *Compare Adequate Remedy at Law*, Black's Law Dictionary (11th ed. 2019) ("A legal remedy (such as an award of damages) that provides sufficient relief to the petitioning party, thus preventing the party from obtaining equitable relief."), *with Irreparable Injury*, Black's Law Dictionary, *supra* ("An injury that cannot be adequately measured or compensated by money and is therefore often considered remediable by injunction.").

[11] 43A C.J.S., *supra*, § 80 ("Irreparable injury is one basis, probably the major one, for showing the inadequacy of any legal remedy. The concepts of 'irreparable injury' and 'no adequate remedy at law' are, in fact, often indistinguishable. The distinction, however, is that the irreparable injury rubric is intended to describe the quality or severity of the harm necessary to trigger equitable intervention; in contrast, the inadequate remedy test looks to the possibilities of alternative modes of relief, however serious the initial injury." (footnotes omitted)).

There are Delaware cases predating *Draper* that highlighted the differences between preliminary and permanent injunctions. For example, in *Turek v. Tull*, this court explained that

> [i]t is established that a preliminary injunction should not issue unless it appears that the plaintiff will suffer irreparable injury, should such relief not be granted. . . . On the other hand, after final hearing of a suit for injunctive relief, the trial court should not be concerned with the convenience of the parties as at that point the preservation of the status quo is no longer a proper matter for judicial consideration. . . . Where, however, plaintiff has at trial established a clear legal right to an injunction, he should normally receive what he has prayed for, assuming he has done equity and not misled his opponent. . . .

139 A.2d 368, 374 (Del. Ch. 1958). And in *Richard Paul, Inc. v. Union Improvement Co.*, the Court of Chancery issued post-trial relief that it described as a "mandatory injunction" after concluding that the plaintiff "would not have adequate relief in an action for damages." 86 A.2d 744, 748 (Del. Ch. 1952) (subsequent history omitted). On appeal, the Delaware Supreme Court affirmed in part, holding that the case presented "a proper situation for equitable relief, viz., the unwarranted invasion of a legal right for which there is no adequate remedy at law." *Richard Paul, Inc. v. Union Improvement Co.*, 91 A.2d 49, 54 (Del. 1952) (explaining that "[t]here is little question but that equity in a proper case will enjoin the continued obstruction of an easement, and that the obstruction of an easement of itself is sufficient to show the irreparable nature of the injury and the inadequacy of the remedy."). In both decisions, the availability of injunctive relief at the

remedial stage turned on the inadequacy of the remedy at law, with references to irreparable harm playing an instrumental role in establishing the inadequacy of the legal remedy.[12]

### 4.     The Implication For The Governor's Argument

Delaware's current framing of the test for a permanent injunction thus departs unnecessarily from the prevailing formulation. This decision therefore returns to the prevailing test, under which a party must show (i) actual success on the merits, (ii) the inadequacy of remedies at law, and (iii) a balancing of the equities that favors an injunction.

The practical effect of reframing the test is that the Governor cannot argue that the plaintiffs must demonstrate a threat of imminent, irreparable harm to establish a basis for equitable jurisdiction. But all is not lost for the Governor. It is merely necessary to examine his argument through the correct lens.

### B.     The Reasonable-Apprehension Test

Although the Governor cannot rely on a requirement that the plaintiffs plead imminent irreparable harm, there remains a threshold test that the plaintiffs must meet to ground jurisdiction on their request for a permanent injunction. As framed by Chancellor Allen, "for a complaint to properly state a claim cognizable in equity solely because of a

---

[12] In a strange passage, the *Richard Paul* decision took issue with the Court of Chancery's characterization of its remedy as an injunction, commenting that "[i]t must be borne in mind that we are not concerned with an interlocutory application for injunctive relief to preserve the *status quo* pending the final determination of litigation" and asserted that the concept of injunctive relief "in strict terminology should be confined to preliminary or interlocutory injunctions." *Id.* at 122–23. In the high court's view, the Court of Chancery should have called its remedy an "abatement." *Id.* at 123. That semantic assertion does not hold true today.

request for an injunction, the facts alleged must, if assumed to be true, create a reasonable apprehension of a future wrong." *McMahon v. New Castle Assocs.*, 532 A.2d 601, 606 (Del. Ch. 1987) (Allen, C.).

The reasonable-apprehension test balances two competing considerations. On the one hand, injunctions against future wrongdoing are generally unavailable.[13] Instead, the court presumes "that parties will respect any decision rendered by any competent court of this State." *Young v. Red Clay Consol. Sch. Dist.*, 2017 WL 2271390, at *53 (Del. Ch. May 24, 2017) (cleaned up). And that is particularly true where government action is concerned, such that "[p]rospective injunctive relief is generally unavailable where the plaintiff's proposed injunction merely seeks to prospectively compel a government to conform with the interpretation of the law reflected in the proposed declaratory judgment." *Crown Castle Fiber LLC v. City of Wilm.*, 2021 WL 2838425, at *5 (Del. Ch. July 8, 2021).

On the other hand, "[s]imple cessation of an actionably wrongful activity does not remove this Court's ability to grant injunctive relief. Injunctive relief is obviously prospective in nature, focusing on what the defendant is likely to do in the future." *Weiner v. Miller*, 1990 WL 54915, at *1 (Del. Ch. Apr. 27, 1990). Consequently, "where there is reason to believe that a defendant will resume his wrongful course of conduct," a court may issue a permanent injunction. *Id.*

---

[13] *Mock v. Div. of State Police, Dep't of Safety & Homeland Sec.*, 2022 WL 1744439, at *10 (Del. Ch. May 31, 2022); *Preston Hollow Cap. LLC v. Nuveen LLC*, 216 A.3d 1, 10–11 (Del. Ch. 2019); *Organovo Hldgs., Inc. v. Dimitrov*, 162 A.3d 102, 114 (Del. Ch. 2017).

To demonstrate a basis for equitable jurisdiction, a plaintiff must establish "a reasonable apprehension of risk of future breaches of a duty of a predictable type." *Thorpe v. CERBCO, Inc.*, 1996 WL 560173, at \*4 (Del. Ch. Sept. 13, 1996) (Allen, C.). An unsupported, subjection concern about a future harm is insufficient to meet this test. "This court cannot permit its jurisdiction to be invoked simply on the basis of unsubstantiated fear that a legal duty may be breached in an uncertain future." *State ex rel. Brady v. Pettinaro Enters.*, 870 A.2d 513, 536 (Del. Ch. 2005). Put differently, "[e]quity will not issue an injunction merely to allay fears or apprehensions absent some showing that the wrongs complained of are likely to be continued unless restrained." *Beaver Blacktop, Inc. v. Dep't of Transp. of State*, 1991 WL 101375, at \*2 (Del. Ch. June 7, 1991) (Allen, C.).

In this case, the plaintiffs cannot meet the operative standard. They argue that they have a reasonable apprehension that the Governor will re-impose restrictions on worship comparable to the Challenged Restrictions because (1) the COVID-19 pandemic is not over, (2) the Governor continues to maintain that he never violated the plaintiffs' constitutional rights by imposing the Challenged Restrictions, (3) the Governor has not issued a sworn statement averring that he will not impose similar policies affecting religious worship in the future, and (4) there is no mechanism to prevent the Governor from re-implementing similar restrictions. Viewed individually or collectively, these concerns are not sufficient to support equitable jurisdiction.

Initially, the continuing reality of life under COVID-19 is not a sufficient consideration. Although it is true that the virus continues to circulate and mutate, the possibility of a future surge, much less one that will necessitate emergency measures on

48

par with what the world experienced in the first half of 2020, is speculative at best. *See Facer v. Carney*, 2022 WL 1561444, at *1 (Del. May 17, 2022) (TABLE) (describing any "future pandemic" as a "hypothetical scenario"). Moreover, during the more than two years since the Governor lifted the Challenged Restrictions in June 2020, new variants have emerged, and COVID-19 has surged and receded several times. In January 2022, when the Delta and Omicron variants resulted in the Governor re-instituting a state of emergency, his declaration expressly carved out Houses of Worship from otherwise generally applicable safety measures. *See* Dkt. 32, Ex. 13 ¶ C.2.ii.5 ("Masks are not required in [H]ouses of [W]orship or places of religious expression. Individuals in [H]ouses of [W]orship or places of religious expression are strongly encouraged to wear masks and maintain at least six (6) feet of distance between themselves and others outside of that person's household whenever possible."). While past performance is not always an indication of future conduct, it is often the best indication we have. In this case, the fact that the Governor has not imposed anything similar to the Challenged Restrictions during the past two years provides a strong indication of how he will act in the future.

Nor is the Governor's position that the Challenged Restrictions were permissible grounds for prospective injunctive relief. The plaintiffs can litigate the validity of the Governor's position in a court of law and obtain an answer in the form of a declaratory judgment.

The fact that the Governor has not issued a sworn statement disavowing the ability to re-impose limitations similar to the Challenged Restrictions is a factor to consider, but here again, the Governor's record during the past two years also deserves weight. The

49

Governor also has entered into the Bullock Settlement, in which the Governor agreed that he will not impose restrictions that specifically target Houses of Worship and committed not to impose certain categories of restrictions. Admittedly, the plaintiffs are not a party to that settlement agreement, and therefore the plaintiffs have no standing to enforce it, but that is not the issue. The Bullock Settlement remains relevant because it affects the likelihood that the Governor would re-impose something akin to the Challenged Restrictions. The fact that he agreed not to in the Bullock Settlement is a strong indication that the Governor will not take action of that sort.

Finally, it is true that there is no binding legal limitation on the Governor specifically addressing the Challenged Restrictions, but even under the plaintiffs' view of the case, that will remain true until after a final adjudication. The plaintiffs have not sought preliminary injunctive relief to restrain the Governor from acting now. They are content to wait until the case enters the remedial stage. What that likewise means is that the plaintiffs can readily obtain that determination from a court of law in the form of a declaratory judgment. The court presumes that the Governor will follow an authoritative determination from the Delaware courts. If he does not, and if he imposes restrictions on Houses of Worship in the future that run contrary to a declaratory judgment, then coercive relief from this court will be available.

At present, it is theoretically possible that the Governor could impose something akin to the Challenged Restrictions, but it is not sufficiently likely to support the reasonable apprehension necessary for equitable jurisdiction. The proper court to hear this matter is Delaware's court of general jurisdiction, not its special court of equity.

50

### III. CONCLUSION

The court lacks jurisdiction over this dispute. Although the plaintiffs did not have to establish a threat of irreparable harm, they did have to establish a reasonable apprehension that the Governor would engage in conduct that would warrant a permanent injunction. They did not make the necessary showing.

The plaintiffs have sixty days to elect to transfer the case to the Superior Court. 10 *Del. C.* § 1902 ("No civil action, suit or other proceeding brought in any court of this State shall be dismissed solely on the ground that such court is without jurisdiction of the subject matter, either in the original proceeding or on appeal. Such proceeding may be transferred to an appropriate court for hearing and determination, provided that the party otherwise adversely affected, within 60 days after the order denying the jurisdiction in the first court has become final, files in that court a written election of transfer, discharges all costs accrued in the first court, and makes the usual deposit for costs in the second court."). Absent an election, the case will be dismissed.